**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **DR. VANESSA GARCIA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 3:18-cv-00814** |
| **THE METROPOLITAN** | ) | **JURY DEMANDED** |
| **GOVERNMENT OF NASHVILLE AND** | ) | |
| **DAVIDSON COUNTY, TENNESSEE,** | ) | |
| | ) | **Judge Campbell** |
| | ) | **Magistrate Newbern** |
| **Defendant.** | ) | |

---

### DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS
### MOTION FOR SUMMARY JUDGMENT

---

Defendant Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro") provides this Memorandum of Law in support of its Motion for Summary Judgment. For the reasons discussed herein, Metro requests that the Court grant its Motion for Summary Judgment pursuant to Fed. R. Civ. Pro. 56, because Plaintiff's claims fail as a matter of law and there is no genuine issue as to any material fact.

### I.    SUMMARY OF ARGUMENT

This case arises out of Plaintiff's former employment with Metro Nashville Public Schools ("MNPS"), a division of Metro.  (Doc. No. 20).  Plaintiff alleges (1) hostile work environment, (2) retaliation, and (3) retaliatory hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. 2000(e) *et seq.* and the Tennessee Human Rights Act ("THRA"); (4) breach of contract; and (5) violation of Tenn. Code Ann. § 49-5-511(b), a portion

1

of the Tennessee Teacher Tenure Act.[1]  (Doc. No. 20).  Plaintiff's hostile work environment and retaliatory hostile work environment claims fail because she cannot establish that the conduct in question was severe or pervasive, or that Metro was liable.  Similarly, her retaliation claim fails because (1) the alleged adverse action is not causally connected to her protected activity, (2) Metro has a legitimate, non-retaliatory reason for its actions, and (3) Plaintiff cannot show pretext.  Plaintiff's breach of contract claim is wholly unsupported by the record and must likewise fail.  Finally, Plaintiff's claim under the Tennessee Teacher Tenure Act fails because she is not within the class of persons (i.e. tenured teachers) entitled to protection under the statute.

## II.     FACTUAL BACKGROUND

### A.  Plaintiff's Employment with MNPS and MNPS Harassment Policy

Plaintiff was hired by MNPS in 2013 as an Executive Lead Principal, a central office position.  (**Exhibit A**, Plaintiff's Deposition Excerpts ("Pl.'s Dep.") 36:7-25).  By July 2016, she had become the Executive Officer for Elementary Schools.  (Pl.'s Dep, Ex. 2, Pl.'s Resume).

When Plaintiff was hired by MNPS, she received a handbook that outlined MNPS policies.  (Pl.'s Dep. 30:11-15).  MNPS prohibits sexual harassment and retaliation.  (Pl.'s Dep. Ex. 4, Employee Harassment Policy).  Employees are encouraged to report any harassment promptly to any one or all of the following:  (A) the employee's supervisor; (B) the supervisor of the offending person; (C) the principal of the employee's school or the head of the employee's department; (D) the human resources department; and/or (E) the appropriate civil rights coordinator.  *Id.* at MNPS 0704 ("Reporting Harassment").  Plaintiff signed an acknowledgment

---

[1] Plaintiff's Motion for Partial Judgment on the Pleadings (Doc. No. 26) and Metro's Cross Motion for Partial Judgment on the Pleadings (Doc. No. 33) regarding the Tennessee Teacher Tenure Act claim are currently pending. In addition to incorporating the arguments contained in the briefs associated with those pending motions, Metro presents additional arguments in Section E of this brief.

4853-0172-7900
2826592-000016

of receipt of MNPS policies.  (Pl.'s Dep., Ex. 6, Sexual Harassment Policy Acknowledgment).

She testified that she has read the employee harassment policy and acknowledged knowing that

MNPS board policies are available online.  (Pl.'s Dep. 30:14-15, 48:10-20).

### B. Dr. Joseph Becomes the New Director of Schools in May 2016

In May 2016, Dr. Sean Joseph became the new Director of Schools for MNPS.  (**Exhibit

B**, Deposition of Dr. Sean Joseph Excerpts ("Joseph Dep."), 9:9-12, 45:23-24).   MNPS is

organized in a hierarchy structure:  the superintendent, or director of schools, oversees multiple

department chiefs; the chiefs oversee executive officers, who in turn oversee executive directors.

(Joseph Dep. 18:3-19:12).   Mo Carrasco, the alleged harasser in Plaintiff's Complaint, also

joined MNPS that summer, as an executive officer.  (Joseph Dep. 10:6-8).  Dr. Joseph testified

that Mr. Carrasco had been a professional acquaintance of his during his previous employment in

Maryland.[2]  (Joseph Dep. 11:4-12:10).  When Mr. Carrasco called Dr. Joseph inquiring about a

job in Tennessee, Dr. Joseph offered him a position as Executive Officer for Priority Schools.

(Joseph Dep. 10:6-8; 23:11-24).

### C. Plaintiff's Interactions with Moreno Carrasco as Coworkers; Plaintiff Alleges She was Inappropriately Touched by Mr. Carrasco in December 2016

It should be noted that the entire time frame of relevant events occurred over

approximately eighteen months.  For the first year of Mr. Carrasco's time with MNPS, from July

2016 through July 2017, Mr. Carrasco and Plaintiff were both Executive Officers, co-equal

positions.  (*See* Pl.'s Dep., Ex. 2; *see also* Joseph Dep. 10:6-8).  Plaintiff alleges that, while she

did not work directly with Mr. Carrasco at first, she would see him often and he would greet her

---

[2]Plaintiff has attempted to establish that Dr. Joseph and Mr. Carrasco were "good friends."  (Doc. No. 20, pg. 2 ¶ 10).  However, outside of Mr. Carrasco apparently telling Plaintiff he was friends with Dr. Joseph, there is no evidence to support this assertion.  (Pl.'s Dep. 54:8-18).   Dr. Joseph testified that he knew Mr. Carrasco professionally, and that he considered him just a colleague.  (Joseph Dep. 14:1-16:16).  Plaintiff admits she never spoke to Dr. Joseph about his relationship with Mr. Carrasco.  (Pl.'s Dep. 54:12-14, 55:20-22).

4853-0172-7900
2826592-000016

with hugs. (Doc. No. 20, pg. 2 ¶ 11). Plaintiff has identified multiple male coworkers whom she has hugged over the years. (Pl.'s Dep. 76:19-77:24). Plaintiff further testified that, while she found Mr. Carrasco's hugs "uncomfortable," they were not sexually offensive. (Pl.'s Dep. 113:11-13).

Plaintiff claims that, on December 15, 2016, she and Mr. Carrasco were both attending a going-away party for another MNPS employee at the Sinema restaurant. (Doc. No. 20, pg. 3 ¶ 13). Again, Mr. Carrasco was not Plaintiff's supervisor at this time. (Pl.'s Dep. 92:14-20). Plaintiff alleges that at the party, Mr. Carrasco put his arm around her shoulder and his hand touched her breast and he whispered, "If you weren't married, I would so date you." (Doc. No. 20, pg. 3 ¶ 13).

Plaintiff contends that this incident was "witnessed by high officials at MNPS." (Doc. No. 20, pg. 9 ¶ 56). Plaintiff identified Kyla Krengel, Sharon Wright, David Williams, and either Aimee Wyatt or Bill Warren as witnessing Mr. Carrasco whispering into her ear at the party. (Pl.'s Dep. 106:5-17). She testified that she told Nicole Cobb and Bill Warren that Mr. Carrasco had touched her. (Pl.'s Dep. 106:22-107:8). None of these individuals were "high officials" at MNPS: Ms. Krengel was the Director of Social and Emotional Learning; Ms. Wright was an Executive Lead Prinicpal; Mr. Williams was the Executive Director of Instruction; Ms. Wyatt was the Executive Officer of High Schools; Mr. Warren was an Executive Lead Principal; and Ms. Cobb was the Executive Director of Guidance and Counseling. (**Exhibit C**, Declaration of Lisa Spencer ¶ 4-10). None of these individuals has supervisory authority over Plaintiff. *Id.* at ¶ 11. In fact, Plaintiff, as an Executive Officer, outranked all of these individuals except Ms. Wyatt, who was her peer. *Id.* at ¶ 12.

4853-0172-7900
2826592-000016

### D. Plaintiff's Position is Changed During an MNPS Reorganization in 2017

In 2017, MNPS was reorganized into a community superintendent model. (Joseph Dep. 33:23-34:5). Plaintiff's position, along with several others, would not exist in this new system. (Pl.'s Dep. 123:21-124:8). Plaintiff claims that Dr. Sito Narcisse, her direct supervisor at the time, assured her and her coworkers that they would be "the team" moving forward. (Doc. No. 20 ¶ 14). She acknowledges that this statement was not a contract. (Pl.'s Dep. 127:1-128:2).

During the reorganization, four new community superintendent positions would be created. (Pl.'s Dep. 123:6-17). Plaintiff applied for two of these superintendent positions and was selected for a panel interview, but ultimately was not recommended as a finalist by the panel. (Pl.'s Dep. 123:18-23, 129:2-131:25; Joseph Dep. 36:1-5). Plaintiff then met with Dr. Joseph and MNPS Chief Human Resources Officer Deborah Story[3] about other opportunities at MNPS. (Joseph Dep. 36:11-37:25). Dr. Joseph told Plaintiff that she had a variety of options, including newly developed principal supervisor positions and a position in the new Office of Organizational Development, as well as a third position that was going to shortly open up when another employee resigned. (*Id.*; Pl.'s Dep. 125:1-7).

Plaintiff told Dr. Joseph she was interested in taking on the Executive Director of Organizational Development role, a human resources position. (Joseph Dep. 37:19-25; Pl.'s Dep. 122:1-13). Plaintiff had helped Mr. Carrasco develop the strategic plan for this department. (Pl.'s Dep. 118:7-120:1). Plaintiff was aware that Mr. Carrasco would be her supervisor in this new department, and still chose to accept the position. *Id.*

---

[3] Ms. Story was the Executive Officer of Human Resources at MNPS from September 21, 2016, until July 1, 2017, when she became the Chief of Human Resources. (**Exhibit D**, Deposition of Deborah Story ("Story Dep.") 7:3-17).

5

4853-0172-7900
2826592-000016

### E.  Plaintiff is Invited to Mr. Carrasco's Apartment to Work

Plaintiff claims that on June 6, 2017, Mr. Carrasco invited her over to his apartment to continue developing the Organizational Development department.  (Pl.'s Dep. 113:11-23, 117:12-20).  Mr. Carrasco lived off of Demonbreun Street at an apartment called the Element. (Pl.'s Dep. 58:4-6).

Plaintiff claims she told Chris Henson, MNPS's Chief Operating Officer, that Mr. Carrasco had invited her over and she did not "feel comfortable."  (Pl.'s Dep. 161:23-162:22). Plaintiff and Mr. Henson had been friends for approximately twenty years.  (Pl.'s Dep. 43:9-20). Plaintiff claims Mr. Henson told her to check back in with him about how the meeting with Mr. Carrasco went.  (Pl.'s Dep. 161:23-162:22).  Mr. Henson, however, testified that, while he found Mr. Carrasco's request odd, he remembers Plaintiff "laughing" about going over to Mr. Carrasco's apartment for work.  (**Exhibit E**, Deposition of Chris Henson Excerpts ("Henson Dep."), 102:18-103:5).  He testified that Plaintiff did not seem concerned about the situation.  *Id.* He said he thought she had contacted him about it because she thought it was funny.  (Henson Dep. 103:6-19).

Plaintiff claims that, while wrapping up their work at Mr. Carrasco's apartment that day, Mr. Carrasco asked her if she could salsa dance and tried to dance with her.  (Pl.'s Dep. 113:13-23).  Plaintiff told Ms. Carrasco she could not dance, and left.  *Id.*  Plaintiff admitted in her deposition that Mr. Carrasco would sometimes have various executive officers over to the common area of his apartment to work, and that the occasion in question was the only time she was in his apartment alone.  (Pl.'s Dep. 116:18-117:4).

6

### F.  Plaintiff's Alleged Contract Claim and "Stipend" Related to Her Position Change During the Reorganization

During the reorganization, Plaintiff contends that a group of reassigned employees, including herself, took pay cuts, but that one of those coworkers received a $24,000 stipend to make up for that individual's pay decrease.  (Doc. No. 20 ¶ 19).  Plaintiff admits that, when her position was reassigned, she was not promised a stipend.  (Pl.'s Dep. 148:1-5).  However, she claims that board liaison David Sevier later stated that the reassigned employees were supposed to receive a stipend.  (Doc. No. 20 ¶ 19).  Plaintiff admitted she had no contract for either her employment or a stipend.  (Pl.'s Dep. 127:1-6; 148:1-5; 154:17-19; 155:14-156:11).

### G.  Plaintiff's Continuing Interactions with Mr. Carrasco in June and July 2017

On June 28, 2017, Plaintiff accepted a ride with Mr. Carrasco and he allegedly made a comment about having a dream about her getting out of the shower.   (Doc. No. 20 ¶ 21). Plaintiff further claims that, during the first few weeks of July, Mr. Carrasco made several inappropriate comments to her, including that if she kept losing weight she would lose that "ass of yours," telling her at one point he thought they might kiss, and asking her if she wanted to read some "crazy hot" text messages.  (Doc. No. 20 ¶ 22-23).

### H.  Plaintiff Contacts Board Member Amy Frogge about Mr. Carrasco

Plaintiff told Board Member Amy Frogge about Mr. Carrasco's behavior sometime in July 2017.  (Pl.'s Dep. 188:12-15, 191:4-7).  This was not following the protocol established by MNPS policies.  (Pl.'s Dep. Ex. 4, 6).  Plaintiff testified Ms. Frogge is the only board member she spoke to about Mr. Carrasco.  (Pl.'s Dep. 188:12-20).[4]  *Plaintiff admits she specifically asked*

---

[4] Board Member Jill Speering claims that Plaintiff also discussed the harassment with her.  (**Exhibit F**, Deposition of Jill Speering Exhibits ("Speering Dep."), 74:13-75:6).  However, Plaintiff did not include this information in her Complaint (Doc. No. 20), Initial Disclosures (attached hereto as **Exhibit G**), or Interrogatory Responses (attached hereto as **Exhibit H**), and Ms. Speering could not recall specifically what Plaintiff had told her.  (Speering Dep.

4853-0172-7900
2826592-000016

*Ms. Frogge not to tell anyone about Plaintiff's complaint about Mr. Carrasco*. (Pl.'s Dep. 194:1-24; *see also* **Exhibit I**, Deposition of Amy Frogge Excerpts ("Frogge Dep."), 49:3-5).

Ms. Frogge spoke with Plaintiff again in August 2017, and Plaintiff agreed that Ms. Frogge could contact Dr. Joseph about the allegations, so long as she did not disclose Plaintiff's name. (Pl.'s Dep. 195:1-13; Frogge Dep. 49:22-50:1). Ms. Frogge did not take Plaintiff's concerns to anyone but Dr. Joseph. (Frogge Dep. 50:2-4). Dr. Joseph testified that Ms. Frogge told him there was a complaint that Mr. Carrasco was behaving inappropriately, although she did not give him specifics. (Joseph Dep. 139:11-140:12). Dr. Joseph requested that Ms. Frogge tell him the identity of the complainant, because there was little he could do with an anonymous complaint. (Joseph Dep. 140:7-12). Ms. Frogge refused, as Plaintiff had requested anonymity. (Joseph Dep. 139:16-20; Frogge Dep. 49:22-50:1; Pl.'s Dep. 195:5-8).

Dr. Joseph then spoke with Mr. Carrasco to ask if the allegations were true, and Mr. Carrasco denied any wrongdoing. (Joseph Dep. 142:17-143:5). Dr. Joseph was unable to substantiate the claims without Plaintiff's identity. (Joseph Dep. 140:7-12). He also felt unable to report the anonymous complaint when his boss, Ms. Frogge, would not share any more details with him. (Joseph Dep. 146:11-15, 147:6-13).

Plaintiff did not make any additional complaints about Mr. Carrasco after her conversation with Ms. Frogge until several months later. In fact, on September 15, 2017, Plaintiff drove herself and Mr. Carrasco to get Botox together at a business called Let's Face It By Vicki. (Pl.'s Dep. Ex. 10, Vicki Records; Pl.'s Dep. 169:8-12; 170:2-18).[5] Plaintiff now claims Mr. Carrasco continued to call her "baby" or "darling" during this time period, and that in

---

75:1-6). Plaintiff testified under oath that Ms. Frogge was the only board member she spoke to about Mr. Carrasco's behavior. (Pl.'s Dep. 188:12-20).
[5] Both Mr. Carrasco and Plaintiff received Botox treatments that day, although Plaintiff in her deposition at first denied that she also received a treatment. (Pl.'s Dep. 170:23-25; 178:9-19). Plaintiff had received treatments at the same salon on at least one other occasion before taking Mr. Carrasco. (Pl.'s Dep. 171:9-19).

4853-0172-7900
2826592-000016

October he called her and brought up his sexual relationship with his girlfriend. (Doc. No. 20 ¶ 27-28).

### I. Ms. Story Realizes Plaintiff's Position Was Not Properly Moved to the Human Resources Department During the Reorganization

In approximately November 2017, Ms. Story noticed that Plaintiff and a coworker, Mr. Terry Shrader, were not appearing in her full-time equivalency positions or funding for the Human Resources Department, despite the fact that they had been moved into her department in August 2017. (Story Dep. Ex. 11, 2017 Emails). Ms. Story discussed the issue with her H.R. Partner for Strategic Initiatives, Ms. Lisa Spencer. (**Exhibit J**, Lisa Spencer Deposition Excerpts ("Spencer Dep."), 9:17-22, 18:3-15). Ms. Spencer testified that when Plaintiff and Mr. Shrader had been moved into the Office of Organizational Development in August of 2017, "[t]he people were moved to Human Resources, but no positions, no full-time corporate positions or dollars appear[ed] to have come with them." (Spencer Dep. 19:10-15).

In fact, Ms. Story and Ms. Spencer discovered that Human Resources was approximately $700,000 over budget, in part because Plaintiff and Mr. Shrader's funding had not been moved to H.R., and in part because the previous budgets had failed to account for employees' adjusted salaries. (Story Dep. 50:3-5; Spencer Dep. 21:2-8, 29:9-18). After speaking with several people in the finance department, Ms. Story eventually came to believe that she had found Plaintiff and Mr. Shrader's positions within her department. (Story Dep. Ex. 12, Budget Emails).

### J. Plaintiff Becomes Upset After Mr. Carrasco Criticizes Her Job Performance and Reports Him to Human Resources on November 15, 2017

On November 15, 2017, Mr. Carrasco and Plaintiff had a meeting to go over Plaintiff's goal setting for the year. (Pl.'s Dep. 86:6-17). Plaintiff claims that it turned into a performance review. *Id.* Mr. Carrasco allegedly made a comment about her personal life getting in the way

4853-0172-7900
2826592-000016

of her work and stated that Plaintiff was making comments that she "didn't care about anything." Plaintiff disagreed with these comments. (Pl.'s Dep. 197:10-198:2).[6] After the meeting, Plaintiff immediately called Human Resources employee Scott Lindsey to report that she felt she was being harassed by Mr. Carrasco. (Pl.'s Dep. 199:1-23). Plaintiff had known Mr. Lindsey since 2013, and had been aware that he was in human resources and could handle investigations and harassment complaints. (Pl.'s Dep. 200:2-20).

### K. Metro Immediately Investigates Plaintiff's Harassment Allegations

Mr. Lindsey immediately began an investigation, and Mr. Carrasco was put on leave the very next day. (Story Dep. 202:6-203:4; **Exhibit K**, Carrasco Leave Letter). Mr. Lindsey interviewed multiple witnesses, several of whom stated that they too had experienced inappropriate comments or flirtations from Mr. Carrasco, although none had made complaints to Human Resources about Mr. Carrasco prior to this investigation. (**Exhibit L**, Sharon Pertiller Deposition Excerpts ("Pertiller Dep."), 231:14-232:20).

Ms. Deborah Story, the Chief Human Resources Officer, and Ms. Sharon Pertiller, the Executive Officer of Human Resources Talent Strategy, took a more active role in the investigation upon finding out that Mr. Lindsey was not taking proper notes or appropriately documenting the investigation. (Story Dep. 206:2-16; Pertiller Dep. 37:18-25, 121:1-124:18). Ms. Pertiller requested that Mr. Lindsey obtain signed statements from witnesses, to ensure the investigation file was complete. (Pertiller Dep. 121:1-124:18). Plaintiff alleges in her Complaint that Mr. Lindsey was told that he had better get the investigation right for Dr. Joseph (meaning in favor of Mr. Carrasco). (Doc. No. 20 ¶ 34). Ms. Story and Ms. Pertiller both dispute this, and

---

[6] Mr. Carrasco sent a summary of his conversation with Plaintiff to Ms. Story after he had been put on administrative leave. Ms. Story states she did not place it in Plaintiff's personnel file. (Story Dep. 127:24-:128:13, 129:7-9).

4853-0172-7900
2826592-000016

insist the only thing Mr. Lindsey was told was to conduct a thorough investigation. (Story Dep. 209:23-210:12; Pertiller Dep. 203:11-205:2).[7]

Mr. Carrasco contacted Dr. Joseph after the investigation had begun. (Joseph Dep. 177:18-21). Dr. Joseph got the *impression* that Mr. Carrasco wanted to see if Dr. Joseph would help him with the investigation, which Dr. Joseph refused to do. (Joseph Dep. 180:21-181:2). Mr. Carrasco accused Dr. Joseph of making "a pact with the devil" and bringing Mr. Carrasco to Nashville to fire him. (Joseph Dep. 178:1-5).

### L.  Mr. Carrasco Resigns on December 8, 2017, and the Investigation Continues

On December 8, 2017, Mr. Carrasco resigned. (**Exhibit M**, Carrasco Resignation). The investigation into his conduct continued, and Ms. Story requested assistance from Metro in reviewing the file and coming to a final determination, given that it was an MNPS Human Resources employee who was being investigated. (Story Dep. 251:6-23; Pertiller Dep. 119:12-120:9). She was put in contact with the Metro Government Human Resources Assistant Director, Mr. Michael Taylor. (Story Dep. 251:6-23). Mr. Taylor found that Mr. Carrasco had violated MNPS's sexual harassment policy and that disciplinary action would have been taken, had Mr. Carrasco still been employed by MNPS. (Story Dep. Ex. 16, Taylor Report).

### M.  Dr. Sonia Stewart, Who Also Complained About Mr. Carrasco During the Harassment Investigation, is Chosen to Replace Mr. Carrasco

In February or March 2018, interviews were conducted for Mr. Carrasco's now vacant role of Executive Officer of Organizational Development. (Pl.'s Dep. 224:1-225:11). Plaintiff, along with many others, applied for this position, but was not selected. *Id.* The position instead went to Dr. Sonia Stewart, who had also given a statement about Mr. Carrasco during the harassment investigation. (Story Dep. 237:14-18; Pertiller Dep. Ex. 10, Stewart Statement).

---

[7] Mr. Lindsey was later terminated following additional performance issues.

4853-0172-7900
2826592-000016

### N. During the 2018/2019 Budget Process, Ms. Story Comes to Realize Plaintiff's Position and Funding Are Not in the Human Resources Budget

During the annual MNPS budgeting process, once the school board approves a proposed budget, the budget is then sent to the mayor. (Joseph Dep. 48:8-22). After the mayor makes his determination, the budget is reconciled and then sent to Metro council for ultimate approval. *Id.* During budget discussions for the 2018/2019 school year, MNPS requested approximately $44 million in additional funding from the mayor's office, and was given only $5 million. (Joseph Dep. 58:7-15; Story Dep. 80:4-13). Metro Council provided an additional $2 million, but MNPS was still suffering from underfunding and ended up having to cut its budget by approximately $17 million. (Spencer Dep. 33:12-18; Story Dep. 92:2-4; Story Dep. Ex. 18, Reduction Email).

Ms. Story had come to realize that when she had previously thought she had discovered Plaintiff's position in Human Resources, she had actually left other department employees off her original calculations list, and that Plaintiff and Mr. Shrader's positions were in fact not within her department. (Story Dep. 88:21-89:17; Spencer Dep. 25:12-21). She believed that Plaintiff and Mr. Shrader's positions were elsewhere in the budget, and that she could eventually have them transferred into HR. (Story Dep. 147:8-11, 151:7-152:24). However, after meeting with the other department chiefs during the budget season, Ms. Story learned that Plaintiff and Mr. Shrader's positions were not elsewhere and that all the other departments were also over budget. (Story Dep. 150:16-151:1).

As noted, Ms. Story's department was already approximately $700,000 over budget. (Story Dep. 166:21-23). Because of the deficit, Ms. Story would be unable to secure the additional funding needed for Plaintiff and Mr. Shrader's positions. (Story Dep. 165:24-166:4). Ms. Story was forced to terminate Plaintiff, Mr. Terry Shrader, and Mr. Craig Ott. (Story Dep. 36:18-37:6). Because Plaintiff and Mr. Shrader had never been funded through Human

12

Resources, their positions were not included in the "positions reduced" category for H.R. on the approved MNPS budget. (Story Dep. 39:4-12; 123:10-22). Mr. Ott's salary was assumed by Metro Government so that he could continue work on one of their projects, but had that not occurred, he would have lost his employment. (Story Dep. 76:8-15).[8] Plaintiff received notice of the non-renewal of her employment on May 11, 2018. (Story Dep. 189:19-190:3). She was paid through June 30, 2018. (Pl.'s Dep. 242:24-25).[9]

## III.    LAW AND ARGUMENT

### A. Plaintiff Was Not Subject to a Hostile Work Environment Because Mr. Carrasco's Conduct Was Neither Severe Nor Pervasive and Because Plaintiff Cannot Establish Employer Liability

To establish a *prima facie* case for hostile work environment, Plaintiff must show by a preponderance of the evidence that: (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) the harassment unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment; and (5) there is a basis for employer liability. *Williams v. CSX Transp. Co., Inc.*, 533 Fed.Appx. 637, 640-41 (6th Cir. 2013). "To meet the fourth requirement, the harassing conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Id.* at 641. A court must consider the totality of the circumstances when determining whether the alleged harassment is severe or pervasive enough to constitute a

---

[8] Plaintiff has attempted to establish in depositions that Mr. Ott did not lose his job at MNPS. This is contradicted by his own testimony, (Q: Okay. And then what happened? Was it eliminated? A: Yes, my job was eliminated." **Exhibit N**, Craig Ott Deposition Excerpt ("Ott Depo."), 8:1-13). Mr. Ott is only still employed because Metro government picked up funding his position to continue his work on a specialized project for Metro.

[9] Plaintiff is currently employed as a Director of Instructional Practice Programs and an associate professor at Lipscomb University. (Pl.'s Dep. 255:22-25). Of particular note, she had applied for the position back in March 2018, well before her position with MNPS was eliminated, and transitioned immediately into it upon the end of her MNPS employment. (Pl.'s Dep. 250:12-21).

4853-0172-7900
2826592-000016

hostile work environment. *Bowman v. Shawnee State Uni.*, 220 F.3d 456, 463 (6th Cir. 2000). Plaintiff cannot establish a *prima facie* case of hostile work environment, because Mr. Carrasco's behavior was not severe and pervasive, and there is no basis for employer liability, as Plaintiff did not follow the reporting structure set in place by Metro and MNPS.

### 1. Mr. Carrasco's Conduct was Not Severe or Pervasive Because His Behavior was Comprised of Isolated, Merely Offensive Comments

First, Mr. Carrasco's conduct towards Plaintiff was not severe or pervasive enough to constitute a hostile work environment. "To be actionable, the harassment must consist of more than words that simply have sexual content or connotations." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008); *see also Knox v. Neaton Auto Products Mfg., Inc.*, 375 F.3d 451, 459-60 (6th Cir. 2004) (holding that various comments and foul language were not severe or pervasive). "Instead, the workplace must be permeated with 'discriminatory intimidation, ridicule or insult' sufficiently severe or pervasive to alter the conditions of employment." *Hawkins*, 517 F.3d at 333 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65-67 (1986)). Factors the Court should consider to determine whether conduct was severe or pervasive "'include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Bowman*, 220 F.3d at 463 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

Plaintiff summarizes Mr. Carrasco's offensive verbal conduct as follows: he sometimes would greet her by calling her "baby" or "darling"; he once told her he had a dream about her getting out of the shower with tattoos on her back; he once said that she would "lose that ass of yours" if she kept losing weight; he commented that he once thought they were going to kiss; and he discussed his dating life on two known occasions. (Doc. No. 20). These do not rise to the

14

level of severe or pervasive. Conduct that is "merely offensive" is not actionable. *Booth v. Nissan North America, Inc.*, 2018 WL 3959553, at *3-4 (M.D. Tenn. Aug. 17, 2018) (J. Campbell).

Additionally, Plaintiff identifies only a few comments that occurred over the span of a year; this is not enough to constitute 'severe' or 'pervasive' conduct. *See Graves v. Dayton Gastroenterology, Inc.*, 657 Fed.Appx. 485, 489-90 (6th Cir. 2016) (finding text messages from a coworker about plaintiff having "wild sex" with her husband was not severe or pervasive); *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 351-52 (6th Cir. 2005) (finding no hostile work environment where plaintiff alleged isolated incidents of her supervisor telling vulgar jokes, twice placing his vibrating pager on her thigh, and pulling on her overalls after asking what type of underwear she was wearing); *Knox v. Neaton Auto Prods. Mfg., Inc.*, 375 F.3d 451, 459-60 (6th Cir. 2004) (finding no hostile work environment where the plaintiff's coworker continuously commented on a woman's physical appearances and spoke at the shift meetings about sleeping with different women); *Burnett v. Tyco Corp.*, 203 F.3d 980, 984-85 (6th Cir. 2000) (finding that three sexually offensive remarks made by a supervisor in a six-month period did not constitute pervasive discriminatory conduct).

Importantly, the only times Plaintiff claims Mr. Carrasco touched her were (1) at the December 15, 2016, party at Sinema, when he allegedly touched her breast after putting his arm around her shoulders and (2) on June 6, 2017, when he tried to get her to salsa dance with him. (Doc. No. 20, pg. 3-4). These two events occurred approximately six months apart.

During the incident at Sinema, Mr. Carrasco was not Plaintiff's supervisor. (Pl.'s Dep. 92:14-20). The incident occurred after work hours, at a going-away party for a coworker. (Pl.'s Dep. 93:15-20). MNPS did not pay for the facility or for the bar. (Pl.'s Dep. 104:3-10). MNPS

4853-0172-7900
2826592-000016

should not be held liable for the actions of a non-supervisory employee at an after work party. *See Hawkins*, 517 F.3d at 335 (noting that the 6th Circuit has not decided whether off-premises harassment by a coworker may be considered as part of the severe and pervasive test under Title VII's sexual harassment provisions, but that other courts have held that "generally an employer is not liable for the harassment or other unlawful conduct perpetrated by a non-supervisory employee after work hours and away from the workplace setting.").

Furthermore, these two isolated incidents, which occurred over six months apart, are neither severe nor pervasive, nor were they physically threatening to Plaintiff. *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 459, 464 (6th Cir. 2000) (dismissing hostile work environment claim where the plaintiff claimed his supervisor rubbed his shoulder and "grabbed his buttocks," and finding that those events, even considered with a handful of sexually suggestive comments by the supervisor, was not sufficiently severe or pervasive to create a hostile work environment); *Stacy v. Shoney's Inc.*, No. 97-5393, 1998 WL 165139, at *1-3 (6th Cir. 1998) (affirming summary judgment for an employer on a state law claim of sexual hostile work environment analyzed under Title VII and federal precedent, where a male supervisor made several sexually suggestive comments about female plaintiff's appearance, touched her breast as he removed and replaced a pen from her shirt pocket, and leered at her); *Carter v. Youth Opp. Inv., LLC*, 2019 WL 1491739, at *3 (M.D. Tenn. Apr. 4, 2019) (dismissing a complaint where plaintiff for hostile work environment where plaintiff claimed her supervisor hit her on the butt with the his key strap) (J. Trauger). Mr. Carrasco's behavior may have been inappropriate and

16

4853-0172-7900
2826592-000016

violated MNPS policy, but it does not equate to severe or pervasive conduct that can support a claim of hostile work environment.[10]

## 2. There is No Basis for Employer Liability Because Plaintiff Did Not Follow the Reporting Structure Put in Place by MNPS

Second, Metro and MNPS did not know of Mr. Carrasco's behavior because Plaintiff failed to follow the reporting structure set in place. MNPS policy lists several individuals to whom Plaintiff could have reported Mr. Carrasco's harassment: the supervisor of the offending person or the principal of the employee's school or the head of her department (Ms. Story in both instances); the Human Resources department; or the appropriate civil rights coordinator. (Pl.'s Dep. Ex. 4).[11] Plaintiff was familiar with these policies, and signed an acknowledgment that she had read and understood them when she was hired. (Pl.'s Dep. Ex. 6).

Plaintiff did not approach anyone covered by this policy, but instead approached a board member, Amy Frogge, and allegedly approached Chris Henson. (Pl.'s Dep. 191:4-7; 162:6-22). However, Mr. Carrasco's request that Plaintiff come to his apartment to work on a project with him is insufficient, without more, to put Mr. Henson on notice of any harassment. In fact, Mr. Carrasco had had groups of employees, including Plaintiff, over to work at his apartment before. (Pl.'s Dep. 116:18-117:4). Furthermore, Mr. Henson testified that Plaintiff was laughing about the situation when she called him and did not seem concerned. (Henson Dep. 102:18-103:5). Plaintiff's call to Mr. Henson did not put him on notice that anything inappropriate may have

---

[10] Plaintiff may claim that because other individuals also complained about Mr. Carrasco's flirtation and occasionally inappropriate comments during the sexual harassment investigation, his conduct must have been severe or pervasive. While the Sixth Circuit has recognized that a court may consider evidence of other acts of harassment a plaintiff becomes aware of during her employment, a plaintiff's knowledge of other acts of harassment will not necessarily establish a hostile work environment. *Hawkins*, 517 F.3d at 335. Plaintiff appears to have learned about most of the other alleged incidents after she filed a complaint with human resources. (Pl.'s Dep. 111:14-22; 61:7-17; 85:6-86:5). Mr. Carrasco was placed on leave the day after Plaintiff filed her H.R. complaint. (**Exhibit K**).

[11] The policy also indicates an employee may complain to his or her own supervisor, however, in this instance, the alleged harasser became Plaintiff's supervisor in July 2017.

4853-0172-7900
2826592-000016

occurred. Additionally, Plaintiff recognized that Mr. Henson was not identified by the policy as someone she should contact about allegations of harassment. (Pl.'s Dep. 161:23-162:8).

In both of Plaintiff's conversations with Ms. Frogge, Plaintiff requested to remain anonymous. (Pl.'s Dep. 194:1-24; 195:1-13). Courts have recognized that complainants sometimes wish to remain anonymous, and cannot impute responsibility on the employer for knowing about the alleged harassment when they themselves made the decision to keep their identity a secret. *Torres v. Pisano*, 116 F.3d 625, 639 (2d Cir. 1997) ("[T]he law will not presume in every case that harassed members of Title VII's protected classes do not know what is best for themselves and cannot make reasonable decisions to delay . . . pursuing harassment claims."). Plaintiff had known the employee in Human Resources who was responsible for sexual harassment investigations, Mr. Scott Lindsey, since 2013. (Pl.'s Dep. 200:2-10). She was aware of the sexual harassment reporting policy at MNPS. (Pl.'s Dep. Ex. 4, 6). She could have, at any time, followed that policy and reported Mr. Carrasco to Mr. Lindsey. By failing to do so, she deprived MNPS and Metro of the opportunity to respond appropriately.

Once Plaintiff did follow procedure and complain to Human Resources, MNPS placed Mr. Carrasco on leave the very next day and immediately began an investigation. (**Exhibit K**). He never returned to supervising Plaintiff, and resigned less than a month later. (**Exhibit M**). Once MNPS was aware of Plaintiff's complaint against Mr. Carrasco, it took immediate and effective action. Plaintiff's claim must therefore fail.

### B. Plaintiff Cannot Establish a *Prima Facie* Case of Retaliation and Metro Has a Legitimate, Non-Retaliatory Reason for Its Actions

To establish a *prima facie* case of retaliation, Plaintiff must prove: (1) she engaged in activity protected by Title VII; (2) the exercise of her protected rights was known to Metro; (3) Metro thereafter took adverse employment action against her; and (4) there was a causal

4853-0172-7900
2826592-000016

connection between the protected activity and the adverse employment action. *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013). To establish a causal connection, Plaintiff must prove that her protected activity was a "but-for" cause of Metro's alleged adverse action. *Benefield v. Mstreet Entertainment, LLC*, 197 F. Supp.3d 990, 1005 (M.D. Tenn. 2016). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Uni. of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

If Plaintiff establishes a *prima facie* case, Metro is entitled to produce evidence of a legitimate, non-retaliatory reason. *Barrow v. City of Cleveland*, 2019 WL 2000389, at *5 (6th Cir. May 7, 2019). Once Metro has done so, Plaintiff must prove that Metro's proffered reason is pretextual. *Id.* Plaintiff alleges she did not receive a promotion and was terminated for complaining about Mr. Carrasco, and that Mr. Carrasco retaliated against her by giving her a negative review. (Doc. No. 20). None of these claims establish a *prima facie* case of retaliation, and Metro has legitimate, non-retaliatory reasons for its actions, for which Plaintiff cannot show pretext.

### 1.    A Negative Performance Review is Not an Adverse Action

Plaintiff alleges that she suffered "retaliation" by Mr. Carrasco for her complaint to Amy Frogge, because Mr. Carrasco supposedly gave her a negative performance review four months later. (Pl.'s Dep. 220:9-13, 222:3-10). However, a "negative performance evaluation does not constitute an adverse employment action unless the evaluation has an adverse impact on an employee's wages or salary." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008) (quoting *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007)). "[T]o characterize a negative performance evaluation as an adverse employment action, 'the plaintiff

4853-0172-7900
2826592-000016

must point to a tangible employment action that she suffered, or is in jeopardy of suffering, because of the downgraded evaluation.'" *Id.* (quoting *Morris v. Oldham Cty. Fiscal Ct.*, 201 F.3d 784, 789 (6th Cir. 2000)). The Sixth Circuit "has stated . . . that a verbal reprimand, without evidence that it is more than criticism, does not constitute an adverse employment action." *Mocic v. Sumner Cty. Emergency Medical Serv.*, 929 F.Supp.2d 790, 800-01 (M.D. Tenn. 2013) (J. Nixon).

Plaintiff has not alleged that she suffered any effect on her employment as a result of Mr. Carrasco's supposedly negative review. Deborah Story did not even receive the alleged review, which she indicated was a "letter," until after Mr. Carrasco was accused of misconduct and placed on leave. (Story Dep. 128:4-129:4, 129:25-2). Ms. Story stated she did not place the letter in Plaintiff's file. (129:7-9).[12] Plaintiff's claim must fail.

### 2. There is No Causal Connection Between Any Adverse Action and Plaintiff's Complaint

The causation element for retaliation requires a showing of "but-for" causation, "meaning that the plaintiff must furnish evidence that 'the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Barrow*, 2019 WL 2000389, at *5 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). Plaintiff cannot show that "but for" her complaint about Mr. Carrasco, she would have been promoted to the Executive Officer of Organization Development position or that her employment would not have been terminated.

The only evidence Plaintiff could argue relating to causation is the temporal proximity between her complaint and the supposedly adverse actions. However, the 6th Circuit "generally

---

[12] Ms. Story believed the document had been pulled from MNPS's database as part of discovery for this case. (Story Dep. 128:16-22).

20

caution[s] against the permissibility of drawing an inference of causation from temporal proximity alone." *Id.* at *6. It is only where the temporal proximity is "very close in time" that it may be significant enough to constitute evidence of a causal connection to satisfy the prima facie burden. *Id.* A "gap of approximately four-to-five months is insufficient, without additional evidence, to imply causation." *Id.* (relying on *Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 628 (6th Cir. 2013)).

Plaintiff made her complaint about Moreno Carrasco on November 15, 2017. (Pl.'s Dep. 211:12-212:2, 202:5-25). He was placed on leave the next day, and resigned in early December. (**Exhibits K, M**). Plaintiff did not interview for his position until February or March of 2018, approximately three to four months after Plaintiff's complaint. (Pl.'s Dep. 224:1-225:1). Furthermore, Plaintiff's employment was not terminated until May 2018, approximately six months after her complaint. (Story Dep. 189:19-190:3). This is too long a gap between the protected activity and adverse action to constitute causation. *See Barrow*, 2019 WL 2000389 at *6-7 (finding that a five-and-a-half month gap between an EEOC complaint and the alleged retaliation was insufficient to establish a causal connection without additional evidence). Plaintiff has not alleged any additional evidence of retaliation, and, thus, she has failed to establish a *prima facie* case of retaliation.

### 3. Metro Has Legitimate, Non-Retaliatory Reasons Which Are Not Pretextual

#### i. MNPS Selected the Best Candidate for Mr. Carrasco's Position

After Mr. Carrasco resigned, his position was posted several months later. (Pl.'s Dep. 224:1-225:1). Plaintiff applied for the position. *Id.* Ms. Story ultimately selected Dr. Sonia Stewart to serve in the role. (Story Dep. 237:14-18). Ms. Story testified that the reason she chose Dr. Stewart was because Dr. Stewart was able to articulate a vision for moving the

4853-0172-7900
2826592-000016

department forward in a way that some of the other candidates, including Plaintiff, were not able to. (Story Dep. 236:19-237:7).

Plaintiff may argue that Ms. Story's reason for selecting Dr. Stewart was pretextual, because Plaintiff had previously worked as an Executive Director within the Office of Organization Development. However, Ms. Story testified that none of the individuals interviewed had experience supervising the relatively new department as an executive director. (Story Dep. 235:5-15). Furthermore, while Plaintiff and Mr. Shrader had operated the department in Mr. Carrasco's absence, nothing of significance had occurred during that approximately three to four month period to indicate that they were right for the position. (Story Dep. 238:11-239:25). Finally, Dr. Stewart also made a complaint about Mr. Carrasco during the harassment investigation, yet was selected for the job by Ms. Story. (Pertiller Dep. Ex. 10). Metro had a legitimate, non-retaliatory reason for not giving Plaintiff Mr. Carrasco's position, and she cannot show pretext. Thus, her claim fails.

### ii. Plaintiff Was Terminated Because Her Position Was Not Properly Transferred to Human Resources and Human Resources was Over Budget

Furthermore, Metro/MNPS had a legitimate, non-retaliatory reason for terminating Plaintiff's employment. Ms. Story had discovered that Plaintiff and Mr. Shrader's positions were not moved to the Human Resources budget in early November 2017, before Plaintiff made her complaint against Mr. Carrasco. (Story Dep. Ex. 11). She spent the next six months attempting to rectify the situation. (Story Dep. Ex. 12).

Ms. Story and Ms. Spencer testified that there was a budget deficit of over $700,000 in HR due to the fact that employees' actual salaries were not reflected in the budget and due to the fact that Plaintiff and Mr. Shrader were being paid out of the HR budget, despite the fact that

22

their funding had not followed them into the department.  (Story Dep. 50:3-5; Spencer Dep. 21:2-8, 29:9-18).  Ms. Spencer testified that even though Plaintiff's pay was coming from a Human Resources code, that did not mean her funding or position had been moved to HR. (Spencer Dep. 49:6-25).  In fact, it is precisely because Plaintiff and Mr. Shrader were being paid from Human Resources despite the fact that their funding was not moved that HR became so over budget.  (Spencer Dep. 50:1-4).  After MNPS was instructed to cut $17 million from its budget, Ms. Story was forced to eliminate the only two positions that were not budgeted: Mr. Shrader's and Plaintiff's, as well as one highly-compensated individual, Mr. Ott.  (Story Dep. 226:18-227:1).

Plaintiff is unable to be able to show that this non-retaliatory reason is pretext.  To establish pretext, a plaintiff must show that (1) the proffered reason had no factual basis, (2) the proffered reason did not actually motivate Defendants' action, or (3) the proffered reason was insufficient to motivate the action.  *Levan v. Sears, Roebuck & Co.*, 984 F.Supp.2d 855, 865-67 (E.D. Tenn. 2013).  While evidence supporting allegations of pretext often overlap with evidence supporting the causation element of Plaintiff's *prima facie* case, "the burden at the *prima facie* stage is more easily met and that evidence may be insufficient, standing alone, to raise a genuine issue as to pretext."  *Id.* at 867 (quoting *Adair v. Charter Cty. of Wayne*, 452 F.3d 482, 491 (6th Cir. 2006)).

Ms. Story and Ms. Spencer testified in depth as to the issues and confusion surrounding the funding of Plaintiff and Mr. Shrader's positions.  (Spencer Dep. 19:10-15; Story Dep. 150:16-151:1, 165:24-166:4).  There is no dispute that MNPS suffered a budget crisis during the 2018/2019 budget season.  (Joseph Dep. 48:8-22; Story Dep. Ex. 18).  Plaintiff has made much over the fact that Plaintiff and Mr. Shrader were not included on the "positions eliminated" list

4853-0172-7900
2826592-000016

for the 2019 budget. However, Ms. Story testified that Plaintiff and Mr. Shrader were not on the list because their positions were never in Human Resources to begin with. (Story Dep. 39:4-12; 123:10-22). Mr. Henson further testified that someone could lose a job at MNPS, and their termination would not be reflected on the budget if the total number of positions in the department remained the same. (Henson Dep. 76:11-21). While he stated that eliminating a *position* might be different, he admitted that he learned during the budget process that there were more employees in Human Resources than budgeted-for positions. (Henson Dep. 76:22-24, 130:20-131:22).

In addition, Plaintiff has attempted to establish in depositions that, had MNPS eliminated vacant positions, they could have kept Plaintiff; however, the facts show that those vacant positions were necessary for the overall strategy for Human Resources. (Story Dep. 122:13-15). However, MNPS is not required to cut other positions to retain Plaintiff. Plaintiff's position was one of only two that were not properly funded in the Human Resources department, and Human Resources needed to keep the vacant positions available. Therefore, Plaintiff's claim must fail.

### C. Plaintiff Did Not Suffer a Retaliatory Hostile Work Environment

To prevail on a claim of retaliatory hostile work environment, a plaintiff must show that (1) she engaged in protected activity; (2) the defendant was aware that the plaintiff engaged in the protected activity; (3) the plaintiff suffered severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the harassment. *Cleveland v. Southern Disposal Waste Connections*, 491 Fed.Appx. 698, 707 (6th Cir. 2012). Plaintiff has established no basis for this claim. After Plaintiff made her complaint about Mr. Carrasco, she does not allege that she suffered any "severe or pervasive" retaliatory treatment. Mr. Carrasco was put on leave the day after Plaintiff made her complaint; he had no

24

opportunity to create a retaliatory hostile work environment for her. (**Exhibit K**). In her Complaint, Plaintiff claims her failure to be promoted into Mr. Carrasco's position and her later termination caused a retaliatory hostile work environment. (Doc. No. 20 ¶ 62). As discussed above, these claims are insufficient to show retaliation.

Plaintiff points to two isolated and unrelated events to try to evidence retaliatory hostile work environment: (1) a Thanksgiving text message from Mr. Carrasco; and (2) the playing of "Blow the Whistle" at a principal's meeting. (Doc. No. 20). The text in question stated "Happy Thanksgiving, Vanessa. I hope your home is filled with peace and kindness. God looks out for those who are righteous and forgives those who are not. Be blessed.", and it was texted after Mr. Carrasco had already been placed on leave and was no longer supervising Plaintiff. (Pl.'s Dep. 232:16-24). Furthermore, Plaintiff has failed to establish any evidence that playing "Blow the Whistle" at a principal's meeting was meant to be directed at her. Plaintiff claims a fellow principal asked if it was about her, but stated she did not even know for certain it was related to the Carrasco investigation. (Pl.'s Dep. 235:19-236:1). Generously put, these two occurrences "amount to a few isolated incidents that [are] infrequent and harmless," and, thus, Plaintiff has failed to show that such actions were severe or pervasive. *Cleveland*, 491 Fed.Appx. at 708.

Plaintiff may argue that she suffered a retaliatory hostile work environment after her complaint to Ms. Frogge, her claim still fails.[13] The only behavior Plaintiff complains of after that discussion is Mr. Carrasco sometimes calling her "baby" or "darling," one phone call where Mr. Carrasco discussed a sexual partner, and the supposedly negative review she received four months after Dr. Joseph approached Mr. Carrasco about an anonymous complaint against him.

---

[13] It is worth noting that Mr. Carrasco could not have identified Plaintiff as the complainant following his discussion with Dr. Joseph. Ms. Frogge and Dr. Joseph both testified that Dr. Joseph did not know Plaintiff was the complainant. (Joseph Dep. 139:11-140:12; Frogge Dep. 49:22-50:1). Additionally, Ms. Frogge did not share all the details of the complaint, and some of the allegations were changed when she spoke with Dr. Joseph. *Id.*

4853-0172-7900
2826592-000016

(Doc. No. 20). As discussed above, these random comments are not severe or pervasive, and a negative performance review is not an adverse action. Plaintiff's claim is wholly unsupported, and Metro is entitled to summary judgment on this issue.

### D. Plaintiff Had No Contract for a Stipend with MNPS or Metro

Plaintiff alleges that she suffered a breach of contract because she did not receive a stipend when her position was changed during the reorganization. (Doc. No. 20). This supposed stipend was never agreed to by Metro, and Plaintiff admits that when her position was changed, she was not promised a stipend. (Pl.'s Dep. 148:1-5). Rather, Plaintiff alleges that board liaison Mr. David Sevier purportedly stated that several reassigned employees, which Plaintiff interpreted to include her, should have received a stipend as part of the reorganization. (Doc. No. 20). This is wholly insufficient to show a breach of contract claim.

To establish a breach of contract claim in Tennessee, Plaintiff must show: (1) the existence of a valid and enforceable contract; (2) a deficiency in performance that amounts to a breach; and (3) damages caused by the breach. *Federal Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011). The record does not reflect any facts that show Plaintiff was in a contractual relationship with Metro with regard to the supposed stipend. A valid contract requires a "meeting of the minds of the parties in mutual assent to the terms" and must be of "sufficient explicitness so that a court can perceive what are the respective obligations of the parties." *Doe v. HCA Health Services of Tennessee*, 46 S.W.3d 191, 196 (Tenn. 2001). Plaintiff's claims that a Board Liaison told her after the fact that she was supposed to get a stipend does not equate to a claim that Plaintiff and anyone at MNPS had a meeting of the minds which resulted in a valid and enforceable contract. Furthermore, it is important to note that only certain individuals can

4853-0172-7900
2826592-000016

enter Metro or MNPS into a contract as a party; board liaison David Sevier is not one of these individuals, nor was Dr. Sito Narcisse.

When pressed in her deposition as to why she was asserting her breach of contract claim, Plaintiff could not express anything more than the fact that she did not believe her position should have been eliminated. (Pl.'s Dep. 241:18-243:11). This is, of course, different than what is alleged in her Amended Complaint, which states her breach of contract claim is solely related to the stipend. (Doc. No. 20 ¶ 66). Plaintiff also stated that she was not even sure what kind of contract she had with Metro, and that she had been paid through the end of her employment term. (Pl.'s Dep. 241:20-243:11). There is absolutely no basis for Plaintiff's breach of contract claim related to any stipend, and, thus, her claim must be dismissed.

### E. Plaintiff Is Not Entitled to Protection under Tenn. Code Ann. § 49-5-511(b) Because Human Resources Did Not Eliminate a Budgeted-For Position

Metro incorporates by reference all of the arguments established in its Cross-Motion for Judgment on the Pleadings (Doc. No. 32-33) and related filings, as well as its response to Plaintiff's Motion for Judgment on the Pleadings (Doc. No. 32). In addition, Tenn. Code Ann. § 49-5-511(b) does not apply to Plaintiff because no Human Resources *position* was eliminated. As testified by Ms. Story and Ms. Spencer, Plaintiff's position and funding did not follow her to Human Resources when she became the Executive Director of Organizational Development. (Spencer Dep. 19:10-15; Story Dep. 39:4-12, 123:10-22). The statute in question requires that the Board approve eliminations of "positions." Tenn. Code Ann. § 49-5-511(b).

In this instance, no Human Resources position was eliminated. Ms. Story had 42.5 positions in Human Resources, with a 44-person headcount. (Spencer Dep. 30:24-32:15). It was at first assumed that Plaintiff's position was included in that 42.5 positions, and only later discovered that she and Mr. Shrader were not. (Spencer Dep. 70:9-21; 108:13-21, 113:12-

4853-0172-7900
2826592-000016

114:20).  Ms. Story ended the employment of Mr. Shrader and Plaintiff, but her number of budgeted positions within Human Resources remained the same.  When the net total of budgeted positions is not reduced, the terminated individual is not reflected in the eliminations to the Board.  (Henson Dep. 21:5-23; 90:8-21; 99:16-20).  Although Plaintiff's employment ended, Human Resources did not eliminate a budgeted position, and, therefore, the Board's approval was not necessary.

## IV.    CONCLUSION

Pursuant to Federal Rule of Civil Procedure 56, there are no genuine issues of material fact and Metro is entitled to judgment as a matter of law on all counts of Plaintiff's Complaint. Metro therefore respectfully requests that this Court grant its Motion and dismiss this case with prejudice.

Respectfully submitted,

s/ Charles K. Grant
Charles K. Grant, BPR No. 17081
Ashton E. Banta, BPR No. 037028
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
Baker Donelson Center
211 Commerce Street, Suite 800
Nashville, TN  37201
Telephone: (615) 726-5600
Facsimile: (615) 726-0464
E-Mail: cgrant@bakerdonelson.com
E-Mail: abanta@bakerdonelson.com

*Attorneys for Defendant Metropolitan Government of Nashville and Davidson County, Tennessee*

4853-0172-7900
2826592-000016

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 22, 2019, a copy of the foregoing *Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment* was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

> Ann Buntin Steiner
> Steiner & Steiner, LLC
> 613 Woodland Street
> Nashville, TN 37206
> Tel.: (615) 244-5063
> Fax: (615) 256-8540
> Email: asteiner@steinerandsteiner.com
> *Attorney for Plaintiff, Dr. Vanessa Garcia*

> s/ Charles K. Grant
> Charles K. Grant

29

4853-0172-7900
2826592-000016