# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| DR. VANESSA GARCIA, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 3:18-cv-00814** |
| v. | ) | |
| | ) | **JUDGE CAMPBELL** |
| THE METROPOLITAN GOVERNMENT | ) | **MAGISTRATE JUDGE NEWBERN** |
| OF NASHVILLE AND DAVIDSON | ) | |
| COUNTY, TENNESSEE, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Plaintiff Dr. Vanessa Garcia brings this case against the Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro") asserting claims arising out of her employment with the public-school system, Metro Nashville Public Schools ("MNPS"). Pending before the Court are Defendant's Motion for Summary Judgment (Doc. No. 47) and Plaintiff's Motion for Partial Summary Judgment. (Doc. No. 59).[1] Defendant's Motion for Summary Judgment is accompanied by a memorandum and exhibits. (Doc. No. 49). Plaintiff filed a response with exhibits (Doc. Nos. 64, 65) and a supplemental response (Doc. No. 69), and Defendant filed a reply (Doc. No. 79). With permission of the Court, Plaintiff also filed a sur-reply. (Doc. No. 84). Defendant moved to strike certain evidence submitted by plaintiff in response to the motion for summary judgment (Doc. No. 74). Plaintiff filed a response in opposition to the motion to strike (Doc. No. 80), and Defendant filed a reply (Doc. No. 88). Defendant filed a statement of facts (Doc. No. 48), to which Plaintiff responded (Doc. No. 66),

---

[1] In what appears to involve fairly straightforward claims of sexual harassment, retaliation, and unlawful discharge, the parties have made over 42 filings in support of nine pending motions. This memorandum addresses only the motions for summary judgment and the associated motion to strike.

and Plaintiff filed a supplemental statement of facts (Doc. No. 67), to which Defendant responded (Doc. No. 73).

Plaintiff's Motion for Partial Summary Judgment (Doc. No. 59) is accompanied by a memorandum (Doc. No. 60), statement of facts (Doc. No. 58), and exhibits (Doc. No. 57). Defendant filed a response to Plaintiff's motion (Doc. No. 70) and statement of facts (Doc. No. 71). Plaintiff filed a reply. (Doc. No. 76).

For the reasons stated, Defendant's Motion to Strike or Exclude Portions of the Declaration of Scott Lindsey and Hearsay Statements from Plaintiff's Response (Doc. No. 74) is **GRANTED** in part, **DENIED** in part. Defendant's Motion for Summary Judgment (Doc. No. 47) is **GRANTED** in part, **DENIED** in part. Plaintiff's Motion for Partial Summary Judgment (Doc. No. 59) is **GRANTED** as to liability.

## I.      BACKGROUND

MNPS employed Plaintiff from July 2013 to May 2018. (Compl., Doc. No. 20, ¶ 6). MNPS is operated by Defendant Metro, a governmental entity. (*Id.*, ¶ 3). During the operative time of the Complaint, Plaintiff served as Executive Officer of Elementary Schools (July 2016 – July 2017), and as Executive Director of Leadership Development[2] (July 2017 – May 2018). (Doc. No. 66, ¶¶ 1, 2). Plaintiff has held a professional teaching license in Tennessee since July 1, 2002, and a professional administrator license since July 28, 2014. (Doc. No. 71, ¶¶ 2, 6). She is not a tenured teacher. (Doc. No. 66, ¶ 3). Her position as Executive Director of Leadership Development required a master's degree and an administrator's license. (Doc. No. 71, ¶ 18).

_____

[2]      Plaintiff's job title for the 2017-2018 academic year was either Executive Director of Organizational Development (Doc. No. 66, ¶ 2) or Executive Director of Leadership Development (Doc. No. 71, ¶ 16, 21). The parties have not argued that the difference in title is material for the Court to rule on the pending motions, thus the Court will not consider as material the different titles.

In July 2016, MNPS hired Moreno Carrasco to an executive position. (Compl., Doc. No. 20, ¶ 9). Plaintiff alleges that Carrasco was "good friends" with Dr. Shawn Joseph, then Director of Schools. (Pl. Aff., Doc. No. 65-1, ¶ 14). Carrasco told Plaintiff that he and Dr. Joseph vacationed together and Plaintiff assisted Carrasco in planning a surprise party for Dr. Joseph at Carrasco's apartment. (*Id.*).

During the 2016-2017 academic year, Carrasco and Plaintiff held positions "on the same level," and reported to the same direct supervisor. (*Id.*; Doc. No. 66, ¶ 4). That year, Plaintiff saw Carrasco once or twice a week at work. (Pl. Aff., Doc. No. 65-1, ¶ 15). When Plaintiff transferred to the Office of Organizational Development for the 2017-2018 academic year, Carrasco became her immediate supervisor. (Doc. No. 66, ¶ 6).

Plaintiff claims that "from almost the time Carrasco arrived at MNPS" he engaged in sexually harassing behavior toward her and others. (Doc. No. 73, ¶¶ 1-25; Pl. Aff., Doc. No. 65-1, ¶¶ 16-20, 29, 34, 36-43, 56). Plaintiff alleges the following harassing behavior by Carrasco toward her personally:

1. Carrasco would "eye" Plaintiff's body. (Pl. Aff., Doc. No. 65-1, ¶ 16).

2. He would call her "baby," honey," and "darling" and often hug Plaintiff while calling her theses names. (*Id.*, ¶ 16).

3. On December 15, 2016, while at a going away party for a colleague, Carrasco "put his arm around me and he laid his hand on my breast and cupped my breast with his hand covering my breast and whispered in my ear, 'You are so hot. If you weren't married, I would so date you.'" (*Id.*)

4. Carrasco told Plaintiff she was the only one he wanted to work for him at a new department. (Id., ¶ 25).

5. When offices were moved because of remodeling, Carrasco denied plaintiffs request switch offices with a colleague because he wanted her in the office next to him. (*Id.*, ¶ 29).

6. Carrasco regularly invited Plaintiff to lunch with wine or for drinks after work. (*Id.*, ¶¶ 32, 42, 43).

7. Carrasco asked Plaintiff to a work meeting alone at his apartment. While at his apartment, he grabbed Plaintiff and tried to salsa dance with her. She took her things and left. (*Id.*, ¶ 34).

8. He said he had a dream about Plaintiff "getting out of my shower." (*Id.*, ¶ 36).

9. He told Plaintiff she "looked really great, but she needed to stop losing weight or she would 'lose that ass of yours.'" (*Id.*, ¶ 37).

10. He told Plaintiff he thought they were going to kiss. (*Id.*).

11. He asked Plaintiff if she wanted to read "crazy hot" text messages between him and an assistant principal. (*Id.*, ¶ 38).

12. He showed Plaintiff pictures of his house in the Dominican Republic and told her to let him know whenever she wanted to go there with him. (*Id.*, ¶ 39).

13. He told her the details about his sex life with other employees and was constantly talking about hooking up with women. (*Id.*, ¶ 40).

14. In October 2017, he called Plaintiff at home and started discussing problems with his girlfriend. Using explicit language, he said Plaintiff would "understand" if only she knew how good his girlfriend was in bed. (*Id.*, ¶ 56).

Plaintiff became aware that Carrasco engaged in similar behavior toward other female employees. (*See e.g.* Doc. No. 73 at ¶¶ 5, 6, 17, 18, 19) (recounting various incidents). Plaintiff claims that Carrasco's behavior caused her a great deal of stress, caused her to lose sleep, and to dread going to work in the morning. (Pl. Aff., Doc. No. 65-1, ¶ 44). She said, "the thought of having to work with him made her feel sick to her stomach." (*Id.*). Plaintiff claims she feared retaliation if she complained about Carrasco because of how close he was to the Director of Schools. (*Id.*) She altered her comings and goings and attempted to leave the office with a co-worker so she would not have to be alone in the office. (*Id.*, ¶ 57). She would ask a co-worker to accompany her if she had to meet with Carrasco in his office. (*Id.*).

Plaintiff told her co-worker, Dr. Terry Shrader, about the harassment. (Doc. No. 73, ¶¶ 8, 22). In July 2017, she told MNPS School Board member Amy Frogge about Mr. Moreno's behavior, but asked Ms. Frogge to keep her identity confidential because she feared retaliation.

(Pl. Aff., Doc. No. 65-1, ¶ 46). Ms. Frogge told Dr. Joseph, the Director of Schools, about Carrasco's behavior without identifying Plaintiff. Dr. Joseph did not report Carrasco's conduct to human resources. (Joseph Dep., Doc. No. 79-5 at PageID# 2212). Instead, Dr. Joseph spoke with Carrasco directly and told him, "If you have done something, I encourage you to go to Human Resources and communicate what happened, but just know if someone reports you must go on leave immediately." (*Id.*)

On November 15, 2017, Plaintiff and Carrasco had a meeting to go over goal setting for the year. (Pl. Dep., Doc. No. 49-2 at PageID# 388). Carrasco allegedly made a comment about Plaintiff's personal life getting in the way of her work and stated that Plaintiff was making comments that she "didn't care about anything." (*Id.* at PageID# 424). Immediately following the meeting, Plaintiff called human resources and made a formal complaint of sexual harassment against Carrasco. (Doc. No. 66, ¶ 14). Scott Lindsey, Director of Human Resources, immediately began an investigation and Carrasco was put on leave the next day. (Carrasco Leave Ltr., Doc. No. 49-12). Lindsey testified that Sharon Pertiller, Executive Officer of Human Resources and Talent Strategy, told him that if he did not get his investigation right, "Dr. Joseph is going to fire you, he's going to fire Deborah [Story] and he may even fire me." (Doc. No. 73, ¶ 41 (citing Lindsey Dep., Doc. No. 62-25 at PageID# 1239)).

November 16, 2017, Carrasco sent Deborah Story, Chief Human Resources Officer, a letter regarding the meeting with Plaintiff the previous day. (Doc. No. 65-33). Defendant characterizes the letter as a "summary" of the meeting. (*See* Story Dep., Doc. No. 49-5 at PageID# 510). Plaintiff characterizes the letter as a "bad evaluation." (*See* Pl. Resp., Doc. No. 64 at 20). Story did not place the letter in Plaintiff's employment file. (Story Dep., Doc. No. 49-5 at PageID# 510).

5

Shortly after Carrasco was placed on leave, he sent Plaintiff the following text message, which Plaintiff has characterized as "threatening": "Happy Thanksgiving, Vanessa. I hope your home is filled with peace and kindness. God looks out for those who are righteous and forgives those who are not. Be blessed." (Pl. Dep., Doc. No. 79-1 at PageID # 2181).

Carrasco resigned on December 8, 2017. (Carrasco Resignation Ltr., Doc. No. 54-13). MNPS continued the investigation into Plaintiff's complaints of sexual harassment, eventually enlisting the assistance of Michael Taylor, Human Resources Assistant Director for Metro Nashville. (Story Dep., Doc. No. 49-5 at PageID# 532). On January 9, 2018, Mr. Taylor sent a letter giving an overview of the investigation and concluding that it "appears Mr. Carrasco violated MNPS' harassment policy" and that disciplinary action would have been taken had Carrasco not resigned. (Doc. No. 49-5 at PageID# 542-43).

Plaintiff claims that after Carrasco's resignation, Deborah Story became her immediate supervisor and was always "very short and curt." (Pl. Aff., Doc. No. 65-1, ¶ 74). In addition, Plaintiff claims she was not invited to meetings and she found it difficult to do her job because MNPS "kept putting up barricades to the interviews" Plaintiff was supposed to conduct with principals. (*Id.*, ¶ 75). Plaintiff "did not feel like a part of the team for the rest of the school year." (*Id.*)

In February and March 2018, MNPS conducted interviews to fill Carrasco's vacant position of Executive Officer of Organizational Development. (Pl. Dep., Doc. No. 49-2 at PageID # 433-34). Plaintiff applied for the position and received an initial interview, but was not selected for a panel interview and, ultimately, was not hired for the position. (Pl. Aff., Doc. No. 65-1, ¶¶ 76, 78). The position was given to Dr. Sonia Stewart, who "best articulated her vision for the department." (Story Dep., Doc. No. 49-5 at PageID#528-29). Dr. Stewart had also

made a statement about Carrasco during the internal investigation. (Stewart Interview Stmt., Doc. No. 49-13 at PageID# 628). Plaintiff claims Dr. Stewart was less qualified for the position and that she had no central office experience. (Pl. Aff., Doc. No. 65-1, ¶ 79).

On May 11, 2018, Plaintiff was informed that budget constraints required the elimination of positions, including hers, with the Human Resources Department. (Doc. No. 71, ¶ 25). Defendant described the decision to eliminate Plaintiff's position as Executive Director of Leadership Development as the consequence of an administrative error. (Spencer Dep., Doc. No. 70-4 at PageID# 1906). When Plaintiff was transferred to the human resources department in 2017, "[t]he people were moved to Human Resources, but no positions, no full-time corporate positions or dollars appear[ed] to have come with them." (*Id.*) As a result, the department had more people than budgeted-for positions. (*Id.* at PageID# 1913). In sum, Defendant states that while Plaintiff had physically moved to human resources and was performing work there as Executive Director of Leadership Development, somehow MNPS had not administratively transferred the budget to pay her salary to human resources or accounted for her position on its list of full-time employees. Metro claims when it came time to cut positions for budget reasons, Dr. Story, the head of the human resources department, decided to eliminate Plaintiff's position because it never really existed in the first place. As Dr. Story confirmed in her deposition, Plaintiff's position was "kind of in the twilight zone somewhere." (Story Dep., Doc. No. 72-3 at PageID# 2049).

The Director of Schools approved the elimination of Plaintiff's position. (Joseph Dep., Doc. No. 70-2 at PageID# 1896). The elimination of Plaintiff's position was never submitted to the school board in the budget proposal or elsewhere. (Def. Resp., Doc. No. 70 at 7). Defendant explained, "Because [their] positions had never been moved to the Human Resources

Department, their positions were not included in the 'positions reduced' category for HR on the approved MNPS budget. While their headcount was eliminated, [human resources] did not reduce the number of [full-time employees], and, thus, did not include their terminations on the budget sheets." (*Id.*)

Days before Plaintiff was informed that her position was being eliminated, Dr. Joseph played a song called "Blow the Whistle" at a principals' meeting. (Pl. Aff., Doc. No. 65-1, ¶ 94; Doc. No. 73, ¶ 40).

Plaintiff brings claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.*, for sexual hostile work environment, retaliation, retaliatory hostile work environment, and for violation of Tenn. Code Ann. § 49-5-511. Defendant filed a Motion for Summary Judgment on all claims. (Doc. No. 47). Plaintiff filed a Partial Motion for Summary Judgment on her claim for violation of Tenn. Code Ann. § 49-5-511. (Doc. No. 59).

## II.     STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks,* 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the nonmoving party's claims. *Id.*

In evaluating a motion for summary judgment, the Court views the facts in the light most favorable for the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 242 (6th Cir. 2015); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the Court determines whether sufficient evidence has been presented to make the issue of material fact a proper jury question. *Id.* The mere scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment; instead, there must be evidence from which the jury could reasonably find for the nonmoving party. *Rodgers* 344 F.3d at 595.

In ruling on a motion for summary judgment, "[a] district court is not … obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). In determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely only upon those portions of the verified pleadings, depositions, and answers to interrogatories, and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties. The Court must consider only evidence that can be presented in an admissible form at trial. *Tranter v. Orick*, 460 F. App'x 513, 514 (6th Cir. 2012) ("The proffered evidence need not be in admissible form, but its content must be admissible.")

## III.    ANALYSIS

### A.  Motion to Strike or Exclude

Before addressing the parties' legal arguments, the Court first considers Defendant's argument that some of the evidence relied upon by Plaintiff is inadmissible and should not be

considered on a motion for summary judgment. Specifically, Defendant moves to strike or exclude paragraphs 13, 14, 17, and 18 from the Declaration of Scott Lindsey (Doc. No. 62-4) on grounds that these are lay person opinion testimony not based on personal knowledge. The Court has not relied on any of these statements in deciding the pending motion. Accordingly, without deciding the admissibility of any of these statements at trial, the portion of the motion addressing the Declaration of Scott Lindsey (Doc. No. 62-4) is DENIED as MOOT.

In addition, Defendant moves to strike 21 statements in Plaintiff's Statement of Additional Material Facts (Doc. No. 67) on grounds that they are inadmissible hearsay. The Court will address these statements by grouping them categorically. First, Plaintiff's testimony of Carrasco's statements to her are not offered for the truth of the matter asserted (e.g., that Carrasco actually dreamt of Plaintiff), but rather as evidence that Plaintiff was subjected to a hostile work environment. Accordingly, the statements offered in paragraphs 7, 8, 10, 11, 12, 14, 15, and 20 are not hearsay.

Statements about harassment made to Plaintiff by others are admissible as evidence of Plaintiff's perception that the work environment was hostile. *See Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 336-37 (6th Cir. 2008) (statement relayed to the claimant regarding similar acts of harassment in the workplace may be admissible for the purpose of showing the effect on the listener (the claimant)); *Bailey v. USF Holland, Inc.*, 444 F. Supp. 2d 831, 852-53 (M.D. Tenn. 2006). Accordingly, statements in paragraphs 5, 6, 17, 18, 19, 23, 24, and 25 are admissible for their effect on the Plaintiff, not to show that Carrasco actually harassed other female employees.

Defendant objects to two statements made by Defendant's human resources investigators. Both statements are testified to by Scott Lindsey as follows:

27.    In fact, Lindsey told Pertiller that the investigation was likely going to result in multiple findings against Carrasco.  Specifically, Pertiller was told, "In my professional opinion, it is likely too much for him to refute.  It is so bad that … [Carrasco] … has violated every type of sexual harassment imaginable." (Citing Lindsey Decl., Doc. No. 62-4, ¶ 9).

28.    Sharon Pertiller told Scott Lindsey that if he did not get his investigation right, "Dr. Joseph is going to fire you, he's going to fire Deborah and he may even fire me." (Citing Lindsey Dep., Doc. No. 62-25 at PageID# 1239).

In the first statement, Scott Lindsey is the declarant.  Mr. Lindsey was the Employee Relations Director for MNPS and was responsible for investigating complaints of sexual harassment.  In the second statement, Sharon Petiller is the declarant.  Ms. Petiller was Executive Officer of Human Resources and Talent Strategy and Mr. Lindsey's supervisor.  Neither statement is hearsay.  Mr. Lindsey's statement that Carrasco has "violated every type of sexual harassment imaginable" was made within the scope of his employment and is properly considered a statement of a party opponent under Rule 801(d)(2).   The statement by Petiller to Lindsey is offered not for the truth of the matter asserted – that Dr. Joseph would actually fire everyone – but as evidence that Pertiller and Lindsey feared retaliation.  Accordingly, neither statement is hearsay under Rule 801.

In paragraph 34, Plaintiff cites interview statements made during the course of the internal investigation by various employees stating that Carrasco engaged in sexually inappropriate conduct toward them.  Plaintiff argues first that these statements are admissible under Rule 803(6) as records of a regularly conducted activity.  Alternatively, Plaintiff argues that the interview statements are statements of a party opponent and admissible under Rule 801.  Finally, Plaintiff argues that these written witness statements are not hearsay because they are not offered for the truth of the matter asserted – that the harassment happened – but to show that supervisors (the witnesses making statements) knew of harassment (their own) and failed to

report it.  First, the witness statements do not qualify for the business records exception as they are not "kept in the course of regularly conducted activity" and they were not made "at or near the time" of the alleged harassment.  *See* Fed. R. Evid. 803(6).  The statements are not statements of a party opponent because, although the witness were employees of Defendant, the statements were not concerning issues within their scope of employment.  *See Huffman v. Speedway, LLC*, 621 F. App'x 792, 799 (6th Cir. 2015) (employee statements were not admissible statements of a party opponent when not within the scope of employment).  Finally, Plaintiff argues that these statements are not offered for the truth of the matter asserted, but to show that the witnesses were harassed by Carrasco and they also failed to report it.  This argument is untenable.  To show that the witnesses failed to report harassment, one would have to first accept that the harassment occurred.  Therefore, the statements *are* submitted for the truth of the matter.  Accordingly, Defendant's objections regarding the witness statements cited in paragraph 34 are well taken and will be excluded for purposes of the motion for summary judgment.

In paragraph 40, Plaintiff states that Dr. Joseph played a song called "Blow the Whistle" at a principals' meeting days before Plaintiff was fired.  She includes the lyrics from the song. Plaintiff's assertion that the fact of Dr. Joseph playing the song is a statement of a party opponent is incorrect.  However, the fact that the song was played is not hearsay as Plaintiff was present at the meeting.

Finally, in paragraph 22, Plaintiff states that she told her co-worker about the harassment and that she was afraid to be alone with Carrasco.  This same information is in Plaintiff's affidavit (Doc. No. 65-1, ¶¶ 29, 30), is based on personal knowledge, and can be reduced to admissible form through Plaintiff's own testimony at trial. *See* Fed. R. Civ. P. 56; *Alpert v. U.S.*, 481 F.3d 404, 409 (6th Cir. 2007) (affidavit based on personal knowledge may be considered in opposition

to summary judgment).  Accordingly, the statement in paragraph 22 is admissible for purposes of the pending motion for summary judgment.

**B.  Hostile Work Environment**

Title VII and the Tennessee Human Rights Act prohibit harassment on the basis of sex.[3] To make out a prima facie claim of sexually hostile work environment under Title VII, a plaintiff must show by a preponderance of the evidence: (1) that she was a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment; and (5) that there is a basis for employer liability.  *Williams v. CSX Transp. Co., Inc*., 533 F. App'x 637, 640 (6th Cir. 2013) (citing *Thornton v. Fed. Exp. Corp*., 530 F.3d 451, 455 (6th Cir. 2008).

Defendant does not dispute that Plaintiff was subject to unwelcome sexual harassment, but argues that Plaintiff has failed to establish that the harassment was severe or pervasive enough to create a hostile work environment or that there is a basis for employer liability.

1.  Hostile Work Environment

To establish a hostile work environment "the harassing conduct must be 'severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive.'" *Id*. at 641. Conduct need not be both severe *and* pervasive to constitute a hostile environment, but may be either sufficiently severe or sufficiently pervasive. *Id*. (citing *Berryman v. SuperValu Holdings,*

---

[3]     The standard for liability is the same under both Title VII and the Tennessee Human Rights Act ("THRA").  *Newman v. Federal Express Corp*., 266 F.3d 401, 406 (6th Cir. 2001).  Accordingly, to the extent Plaintiff's claims under Title VII survive the motion for summary judgment, so do her claims under the THRA.

*Inc.,* 669 F.3d 714, 717 n. 2 (6th Cir. 2012)).  "Isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  Occasional offensive utterances do not rise to the level required to create a hostile work environment because, "[t]o hold otherwise would risk changing Title VII into a code of workplace civility."  *Phillips v. UAW Int'l.*, 854 F.3d 323, 327 (6th Cir. 2017) (citing *Grace v. USCAR*, 521 F.3d 655, 679 (6th Cir. 2008)).

The Court may consider evidence of other acts of harassment of which Plaintiff becomes aware during the period of her employment, even if the other acts were directed at others and occurred outside Plaintiff's presence, because such evidence demonstrates that Plaintiff perceived the work environment was one hostile to her.  *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 335-36 (6th Cir. 2008).

"When determining the relative weight to assign similar past acts of harassment, the factfinder may consider factors such as the severity and prevalence of the similar acts of harassment, whether similar acts have been clearly established or are mere conjecture, and the proximity in time of the similar acts to the harassment alleged by the plaintiff." *Hawkins*, 517 F.3d at 336.  "Summary judgment is appropriate only if the evidence is so one-sided that there is not genuine issue of material fact as to whether there was a hostile work environment." *Id.* at 333.  "Whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is 'quintessentially a question of fact.'" *Id.* (citing *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006)).

The Sixth Circuit has set a high bar for what constitutes a hostile work environment.  *See e.g.*, *Burnett v. Tyco Corp.*, 203 F.3d 980, 981 (6th Cir. 2000) (finding that conduct was not "sufficiently severe or pervasive" to support a finding of a hostile work environment where

plaintiff alleged her supervisor "placed a pack of cigarettes containing a lighter inside [plaintiff's] tank top and brassiere strap," leaving her "stunned, shocked, and exposed," and he twice made inappropriate, sexually charged comments to her"); *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 459 (6th Cir. 2000) (dismissing hostile work environment claim where the plaintiff alleged his supervisor had rubbed his shoulder on one occasion and "grabbed his buttocks" on another; finding these events, even considered in conjunction with a handful of sexually suggestive comments by the supervisor, were not sufficiently severe or pervasive to create a hostile work environment).

Plaintiff submits a long list of allegations of sexually suggestive comments, unwanted touching, and other behavior by Carrasco from June 2016, when he began work at MNPS, until December 2017, when he resigned. One of the most graphic accusations is Plaintiff's statement that Carrasco "put his arm around me and he laid his hand on my breast and cupped my breast with his hand covering my breast and whispered in my ear, 'You are so hot. If you weren't married, I would so date you,'" during a going away party at a restaurant. (Pl. Aff., Doc. No. 65-1, ¶ 16). Plaintiff alleges other female colleagues complained to her of similar behavior by Carrasco that evening. (*Id.*, ¶¶ 19, 20).

Defendant argues that it cannot be liable for Carrasco's actions at the going away party because he was not Plaintiff's supervisor at the time and the incident occurred after work. (Def. Br., Doc. No. 49-1 at 15). In *Hawkins*, the Sixth Circuit did not decide whether off premises harassment should be considered as part of the severe and pervasive test under Title VII because the plaintiff had set forth independent facts sufficient to survive summary judgment. 517 F.3d at 335. However, the *Hawkins* court noted that "although the Sixth Circuit has not directly addressed the issue of off-premises harassment by an employee, 'other courts have held that

generally an employer is not liable for the harassment or other unlawful conduct perpetrated by a non-supervisory employee after work hours and away from the workplace.'" *Id*. (citing *Duggins v. Steak 'N Shake, Inc*., 3 F. App'x 302, 311 (6th Cir. 2001)).

In *Duggins*, the court held that a rape at an private party hosted by another employee could not serve as a basis for a hostile work environment claim. 3 F. App'x at 311. However, the party in *Duggins* is quite different from the party Plaintiff attended. The plaintiff in *Duggins* "was not required to attend this party as part of her job and no manager instructed or encouraged her to attend the party. *Id*. The plaintiff testified that she decided to go to the party because it sounded like fun to attend a party with some of her co-workers." *Id*. at 306. The party at issue in this case was a going away party for a work colleague. Though Plaintiff does not claim she was required to attend the going away party, the party was limited to co-workers, such parties were regularly held for departing co-workers, and other "high-level" MNPS officers and directors attended. The circumstances in the instant case are not comparable to house party hosted by Steak 'n Shake hourly employee who did not even work with the plaintiff in *Duggins*. Moreover, in *Duggins*, the Plaintiff *never* worked with the person who allegedly assaulted her outside of work. *Id*. at 306. The court said that although being required to "work in proximity to someone who is harassing her outside the workplace may reasonably believe the work environment to be hostile," that was not the case in *Duggins* where the Plaintiff and the alleged harasser did not even work together. *Id*. at 311. Unlike the plaintiff in *Duggins*, Plaintiff did work with Carrasco; in fact, they had adjacent offices and he was her direct supervisor. Here, a trier of fact could conclude that Plaintiff having to work closely with Carrasco contributed to her perception that the work environment was hostile to her.

Plaintiff has alleged that over a one-year period Carrasco subjected her to repeated sexual comments and, on at least two occasions, unwanted touching, that amount to more than isolated incidents of harassment. Plaintiff's allegations of specific misconduct increase dramatically after Carrasco became her supervisor. Plaintiff claims that Carrasco's actions made her so uncomfortable that she lost sleep, dreaded going to work, and was afraid to be alone in the office with him. Moreover, Plaintiff's subjective belief that the environment was a hostile one is bolstered by her awareness of Carrasco's alleged behavior toward other women.[4] Plaintiff said she learned either directly from the women or second hand about several other instances of inappropriate conduct by Carrasco toward other women. (*See e.g*., Doc. No. 73 at ¶¶ 5, 6, 17, 18, 19) (recounting various incidents).[5]

Considering the totality of the circumstances, the Court finds that Plaintiff has provided sufficient evidence from which a reasonable jury could conclude that Plaintiff was subjected to a hostile work environment.

2. Employer Liability

"[A]n employer is vicariously liable for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee." *Clark v. UPS*, 400 F.3d 341, 348 (quoting *Jackson v. Quanex Corp*., 191 F.3d 647, 663 (6th Cir. 1999)).

---

[4]     Defendant is correct that the "witness statements" from other MNPS employees about their interactions with Carrasco gathered during the internal investigation are inadmissible hearsay that cannot be considered on a motion for summary judgment. A Court cannot consider hearsay when deciding a summary judgment motion. *Tranter v. Orick*, 460 F. App'x 513, 514 (6th Cir. 2012). Accordingly, the Court has not relied on these statements.

[5]     Plaintiff stated that she learned of incidents of Carrasco's behavior toward three additional women sometime after she filed an official complaint with human resources, but before Carrasco resigned. (Pl. Aff., Doc. No. 65-1, ¶¶ 65-67). These may have contributed to her feeling of hostile environment during these two weeks, but given the limited duration, and that fact that Carrasco was placed on leave during this time, the Court does not consider this a significant contributor.

The employer may assert an affirmative defense to liability, subject to proof by a preponderance of evidence, that (1) the employer exercised reasonable care to prevent and promptly correct any sexually harassing behavior, and (2) the plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities that the employer provided. *Faragher*, 524 U.S. at 807; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

"The affirmative defense encompasses active and inactive components: before the employer can benefit from the defense, it must prove both that it *acted* reasonably in preventing and correcting harassment and that the victimized employee unreasonably *failed to act* by not utilizing complaint opportunities." *Clark*, 400 F.3d at 349 (emphasis in original). "[O]nce an employer has knowledge of the harassment, the law imposes upon the employer a duty to take reasonable steps to eliminate it. Thus, regardless of whether the victimized employee actively complained, prong one of the defense ensures that an employer will not escape vicarious liability if it was aware of the harassment but did nothing to correct it or prevent it from occurring in the future." *Id*.

Under the first element of the affirmative defense, an employer has a duty to prevent sexual harassment by its supervisors. *Shields v. Fed. Exp., Cust. Info. Svc., Inc.*, 499 F. App'x 473, 478 (6th Cir. 2012) (citing *Clark*, 400 F.3d at 349). The existence of an effective policy with complaint procedures can satisfy the first element of the affirmative defense. *See Ellerth*, 524 U.S. at 745. Proof that an employee failed to utilize any of the corresponding antiharassment complaint procedures "will normally suffice to satisfy the employer's burden under the second element of the defense." *Id*.

The Sixth Circuit has held that an effective sexual harassment policy should at least require supervisors to report incidents of sexual harassment, allow employees to make both

formal and informal complaints of harassment, provide a method for employees to bypass a harassing supervisor when making a complaint, and provide for training concerning the policy. *Clark*, 400 F.3d at 349-50. Even assuming the anti-harassment policy satisfies *Clark*, the affirmative duty to prevent or correct sexual harassment does not end with the promulgation of a reasonable sexual harassment policy. *Shields*, 499 F. App'x at 479. "The first element of the affirmative defense 'requires an inquiry that looks behind the fact of a policy to determine whether the policy was effective in practice in reasonably preventing and correcting any harassing behavior.'" *Id*. (quoting *Clark*, 400 F.3d at 349).

In *Clark*, although the parties conceded the defendant had an effective anti-harassment policy "on paper," the court found it was not effective in practice because none of the supervisors who witnessed the harasser's behavior took any action toward stopping the harassment. *Id*. at 350. The defendant in *Clark* argued that the supervisors who witnessed certain incidents of harassment had no duty to report it because none of them was the harasser's superior. The court disagreed, noting that the policy required all supervisors to report incidents of sexual harassment and the supervisors were among those designated to implement the policy. The *Clark* court held that this was enough to create an issue of material fact regarding whether the employer exercised reasonable care in preventing and correcting harassment. *Id*. at 350 ("whether UPS, via these employees, exercised reasonable care is a question for a factfinder").

The anti-harassment policy[6] promulgated by MNPS provided in relevant part:

---

[6] This Harassment Policy was effective May 2016. (*See* Doc. No. 65-26). The policy was updated in May 2018 to require that victims of harassment "shall report these incidents immediately." The updated policy further provides direction that "this report shall be made to the immediate supervisor, except when the immediate supervisor is the offending party. If the immediate supervisor is the offending party, or if the employee is not comfortable reporting the incident to the immediate supervisor, the report may be made to the Executive Director of Employee Relations, the Civil Rights Coordinator, or any other supervisor." (Doc. No. 65-27).

> Any employee who believes he/she is the victim of harassment by a student or employee … should report the harassment promptly. MNPS requires any employee with supervisory authority who witnesses or has knowledge of behavior that may constitute harassment of an employee to report the harassment promptly, but not later than 24 hours after witnessing or learning of the incident. Employees with supervisory authority must report such behavior to the Human Resources Department and, when the behavior may constitute harassment based on actual or perceived membership in a protected class, to the appropriate civil rights coordinator as well.

(MNPS Employee Harassment Policy (May 2016), Doc. No. 65-26 at 3.)

As in *Clark*, MNPS supervisors were required to report any harassment they witnessed or had knowledge of. Plaintiff submits evidence that supervisory level employees were aware of Carrasco's behavior toward her (and others) and did not report his behavior to human resources as required by the anti-harassment policy. For example, Plaintiff claims, and Defendant does not dispute, that several supervisory level employees witnessed Carracso fondle her at a work-related party in December 2016. (Pl. Aff., Doc. No. 65-1, ¶ 17; Doc. No. 73, ¶ 33)[7]. In July 2017, Plaintiff told school board member Amy Frogge about Carrasco's behavior, but asked her to keep it confidential. (Pl. Aff., Doc. No. 65-1, ¶ 46.) After speaking with Ms. Frogge, Dr. Joseph, Director of Schools, knew many details of Plaintiff's harassment complaint, albeit not her identity. (Frogge Dep., Doc. No. 65-5 at PageID# 1589-90). Contrary to the harassment policy in place at the time, the Director of Schools himself appears to have believed that no action was required until an official written complaint was filed with human resources. He testified that he was informed of allegations against Carrasco in July 2017 and rather than go to human resources, he spoke directly with Carrasco:

---

[7]     "Defendant admits for the purposes of summary judgment only that several employees witnessed Mr. Carrasco touching and/or talking to Plaintiff on Dec. 15, 2016; however all of these individuals were in positions lower than Plaintiff except one, who was on the same supervisory level and Plaintiff and Mr. Carrasco." (Doc. No. 73, ¶ 33).

Once the – well, once the allegation was brought to my attention, I – I immediately met – scheduled a meeting with Mo Carrasco that same week. I brought him in my office, and I reported to him that [a school board member] presented an allegation that he inappropriately has been communicating with people; he inappropriately touched people. And I said, I need to know from your perspective, is any of this true? If so, we need to immediately report it to Human Resources. He denied anything happened. He said he doesn't know where it's coming from. And I immediately informed him, Listen, I said, We're in a school system where rumors run rampant. And, you know, I don't know what you're doing or what's happening, but I need you to know the minute – if – if a report is sent to Human Resources, you will immediately go on leave and it will be thoroughly investigated. And I said, If you have done nothing, then you have nothing to worry about. If you have done something, I encourage you to go to Human Resources and communicate what happened, but just know if someone reports you must go on leave immediately.

(Joseph Dep., Doc. No. 79-5 at PageID# 2212). Dr. Joseph said he never reported his conversations with Carrasco to human resources. (*Id.*)

The Court finds that Plaintiff has provided sufficient evidence to establish a question of fact regarding the effectiveness of the anti-harassment policy – particularly whether any of the employees with supervisory authority who were aware of the incidents of harassment should have reported those incidents to human resources and "taken the first steps toward prevention and correction" as required by the policy. *See Clark*, 400 F.3d at 350.

Defendant's argument that Plaintiff did not file an official complaint with human resources until November 2017 and that it acted appropriately once she did so, does nothing to contradict or remedy the evidence indicating that the policy itself was ineffective. The affirmative defense requires that Defendant show both prongs – (1) that it exercised reasonable care to prevent and correct harassment; and (2) Plaintiff unreasonably failed to take advantage of preventative or corrective measures. *Clark*, 400 F.3d at 349. Because Plaintiff has shown there is a genuine issue of material fact regarding whether Defendant exercised reasonable care under prong one of the defense, the Court need not decide whether Plaintiff unreasonably failed

to take advantage of any complaint procedures. *See id.* at 351 (declining to consider prong two when issues of material fact existed as to prong one).

Accordingly, Defendant's motion for summary judgment on Plaintiff's hostile work environment claim is DENIED.

## C. Retaliation

Title VII prohibits employers from retaliating against employees who oppose an unlawful employment practice. 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, Plaintiff must show: (1) she engaged in activity protected by Title VII; (2) the exercise of her protected rights was known to Defendant; (3) Defendant thereafter took an action that was materially adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse action. *Barrow v. City of Cleveland*, 773 F. App'x 254, 261 (6th Cir. 2019). To establish a causal connection, Plaintiff must show that her protected activity was a "but-for" cause of the adverse employment action. *Benefield v. Mstreet Entertainment*, LLC, 197 F. Supp. 3d 990, 1005 (M.D. Tenn. 2016) (citing *Univ. of Tex. Southwestern Med. Ctr. v. Nasar*, 570 U.S. 338, 360 (2013)). If Plaintiff established a prima facie case, the burden then shifts to the Defendant to produce evidence of a legitimate, nondiscriminatory reason for its actions. *Barrow*, 773 F. App'x at 261. "If the defendant satisfies this burden, the plaintiff must then demonstrate by a preponderance of the evidence that the legitimate reason offered by the defendant was not its true reason, but instead was pretext designed to mask retaliation." *Id.* (quoting *Imwalle v. Reliance Med. Prods., Inc*., 515 F.3d 531, 538 (6th Cir. 2008)).

Defendant argues that Plaintiff has failed to establish the third and fourth elements of a prima facie case and that MNPS had non-retaliatory reasons which are not pretextual for the alleged adverse actions.

1. <u>Materially Adverse Action</u>

Title VII's anti-retaliation provision protects an individual "not from all retaliation, but from retaliation that produces an injury or harm." *Barrow*, 773 F. App'x at 262-63 (citing *Burlington N. v. Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)). Consequently, an adverse employment action must be materially adverse. *Id*. at 263. Materially adverse actions are not "limited to [the] narrow definition of an 'adverse employment action' that includes only actions affecting the terms, conditions or status of employment." *Hawkins v. Anheuser–Busch, Inc*., 517 F.3d 321, 346 (6th Cir. 2008) (citation omitted). Instead, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68 (citation and internal quotation marks omitted). "This showing is less burdensome than what a plaintiff must demonstrate for a Title VII discrimination claim." *Rogers v. Henry Ford Health Sys*., 897 F.3d 763, 776 (6th Cir. 2018) (citation omitted).

Plaintiff asserts the following adverse employment actions: she was (1) given a negative review; (2) not invited to a panel interview for the position of Executive Officer of Leadership Development and not hired for the position; (3) not given job assignments or invited to meetings and as a result "did not feel like [she] was a part of the team for the rest of the 2018 school year"; and (4) terminated. (Pl. Aff., Doc. No. 65-1 at ¶¶ 74-78, 88). Any one of these actions could be considered a materially adverse employment action that could dissuade an employee from making a charge under Title VII. *See Barrow*, 773 F. App'x at 263 (finding sufficient evidence

of materially adverse action when plaintiff was reassigned from his preferred vehicle, lost overtime opportunities, and was transferred to administrative duty).

2. Causal Connection

Proof by a preponderance of the evidence is not required at this stage; Plaintiff must produce sufficient evidence from which an inference can be drawn that Defendant took the adverse employment action because of her complaints of sexual harassment. *Singfield v. Akron Metro. Housing Auth*., 389 F.3d 555, 563 (6th Cir. 2004) (finding temporal proximity sufficient to allege causation when the plaintiff was fired three months after filing a charge with the employment commission). "Although no one factor is dispositive in establishing a causal connection, evidence … that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). *See also*, *Little v. BP Exploration & Oil Co*., 265 F.3d 357, 364 (6th Cir. 2001) (evidence plaintiff was terminated less than a year after filing a first EEOC complaint and three months after filing a second created a genuine issue of material fact as to causation). If there is a lapse of time, the employee "must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Singfield*, 389 F.3d at 525. Other evidence supporting a causal link "has commonly included evidence of additional discrimination occurring between the date at which the employer learned of the protected activity and the date of termination or other adverse employment action." *Barrow*, 773 F.3d at 264 (citing *Mickey v. Zeidler Tool & Die Co*., 516 F.3d 516, 525 (6th Cir. 2008).

Plaintiff complained about Carrasco informally in the summer of 2017 and filed an official complaint on November 15, 2017. Immediately thereafter, Carrasco wrote a critical evaluation. (*See* Performance Review, Doc. No. 65-33). She interviewed for the job in February

or March 2018, approximately three months after her complaint. Plaintiff's employment was terminated six months later in May 2018. With the exception of the bad review, the alleged retaliatory conduct might not be close enough in time to establish a causal connection. *See Rodgers v. Henry Ford Health Sys.*, 897 F.3d 763, 776-77 (6th Cir. 2018) (two-month gap is sufficient); *Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 628 (6th Cir. 2013) (four-to-five-month gap is insufficient). However, Plaintiff does not allege only a single instance of retaliatory conduct; she has submitted additional evidence from which a jury could infer a causal link beyond temporal proximity. *See Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435-36 (6th Cir. 2009) (increased scrutiny of employees work prior to termination); *Brown v. Lexington-Fayette Urban Cty. Gov't*, 483 F. App'x 221, 227 (6th Cir. 2012) (plaintiff's supervisor treated her with "exceptional harshness").

Moreover, there is evidence that other employees involved in the investigation feared retaliation. Scott Lindsay, who conducted the internal investigation of Carrasco, stated that he felt threatened with retaliation when Pertiller told him, "If this case did not turn out right, Dr. Joseph is going to fire you, he may fire Deborah Story, he may even fire me but he is definitely going to fire you." (Lindsay Aff., Doc. No. 65-2, ¶ 9; Lindsey Dep., Doc. No. 65-13 at PageID# 1618). He testified that "it was like pulling teeth to even get [witnesses] to sit down and talk with me so – because they were afraid that they would get retaliated against by either Mo or Dr. Joseph, and they did not want to participate in the investigation at all." (Lindsay Dep., Doc. No. 65-13 at PageID# 1617). Finally, Plaintiff stated that at a principals' meeting shortly before her position was eliminated, the Director of Schools played a song called "Blow the Whistle." (Pl. Aff., Doc. No. 65-1, ¶ 94; Doc. No. 73, ¶ 40).

This is not a situation where an employee filed a complaint and then after six months was fired. Plaintiff alleges that she was immediately subjected to retaliatory conduct, which culminated in her termination. This coupled with evidence of a retaliatory atmosphere, is sufficient evidence from which a jury could infer causation.

3. Non-Discriminatory Reason

Plaintiff has established a prima facie case for retaliation. Therefore, the burden of production shifts to the defendant, which may offer a non-discriminatory reason for the adverse employment action. *Ladd v. Grand Trunk W.R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009). To satisfy this burden, Defendant "need only produce admissible evidence which would allow the trier of fact to rationally conclude that the employment decision had not been motivation by discriminatory animus." *Tex. Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 257 (1981).

Defendant does give a "legitimate, non-discriminatory reason" for the critical evaluation Carrasco wrote the day after Plaintiff filed a complaint, but states that the evaluation was never placed in her employment file. Nor does Defendent specifically give a reason for the decision to declare Plaintiff "unqualified" after the first interview and not to grant her an interview with the panel. (Pl. Aff., Doc. No. 65-1, ¶¶76, 78). Defendant claims that it did not offer Plaintiff the position because it hired another more qualified individual who "best articulated her vision for the department." (Story Dep., Doc. No. 49-5 at PageID#528-29). Defendant states that none of the candidates had experience as an executive director in the office of organizational development and, even though Plaintiff and Dr. Shrader had operated the department on an interim basis, "nothing of significance happened during that approximately three-to-four-month period to indicate they were right for the position." (Def. Br., Doc. No. 49-1 at 22). Defendant

notes that the candidate selected for the position also made a complaint about Carrasco during the investigation and was nevertheless hired.

Regarding Plaintiff's termination, Defendant claims this was due to a budget deficit that required the department to cut positions. Ms. Story, Chief of Human Resources, testified that she cut Plaintiff's position because, due to an administrative error, Plaintiff's position had never been properly funded through the department. (Story Dep., Doc. No. 65-21 at PageID# 1649-50).

4. Pretext

The Defendant has given a non-discriminatory reason for the decision not to hire Plaintiff in February or March 2017 and for Plaintiff's termination in May 2017. The burden is now Plaintiff's to demonstrate that the reasons given were "mere pretext." *Ladd*, 552 F.3d at 502. Pretext can be established by showing that the proffered reason was factually false, did not actually motivate discharge, or was insufficient to motivate discharge. *Id*. Courts have recognized that in retaliation cases, an employer's true motivations are particularly difficult to ascertain, thereby frequently making such factual determinations unsuitable for disposition at the summary judgment stage. *Singfield*, 389 F.3d at 564. "[C]aution should be exercised in granting summary judgment once a plaintiff has established a prima facie inference of retaliation through direct or circumstantial evidence." *Id; see also, United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983) (acknowledging that discrimination cases present difficult issues for triers of fact because there is rarely "eyewitness testimony as to the employer's mental process.") "At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation. If so, her prima

facie case is sufficient to support an inference of discrimination at trial." *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 508 (6th Cir. 2014) (citation omitted).

Plaintiff argues that she was better qualified than any of the candidates Defendant interviewed for the position. Plaintiff offers that she had three years of central office experience in a variety of positions and had, in fact, supervised each of the final three candidates, whereas none of the final three candidates had any central office experience. Plaintiff argues that she was the best qualified candidate for the position and had been performing the job, as well as her own job, for several months since Carrasco resigned.

Plaintiff argues that Defendant's explanation that her position was eliminated due to a combination of a clerical error and budget cuts is "bizarre." Plaintiff submits payroll records to show that her position and the associated funding were, in fact, transferred with her to the human resources department and that her position was specifically included in a list of positions given to the School Board as recently as April 2018. (*See* Story Dep., Doc. No. 62-23, Ex. 8 at PageID# 1321). Moreover, Deborah Story testified that in April 2018, Plaintiff had a job that was included in the budget. (*Id.* at PageID# 1270).

Finally, Plaintiff argues that there was, in fact, money in the budget to pay for her position and that Defendant not only added new positions to the budget, but left some positions vacant. According to Plaintiff's analysis of the budget, the funding allocated to new and vacant positions was more than enough to fund, rather than eliminate, her position. (*See* Spencer Dep., Doc. No. 62-24) (discussing budgeting). Defendant responds that the "vacant positions were necessary for the overall strategy of Human Resources" and the MNPS is not required to cut other positions in order to retain Plaintiff. (Def. Br., Doc. No. 49-1 at 24). However, Lisa Spencer, a director in human resources, acknowledged that Plaintiff's position was eliminated both because of a budget

shortfall and because Spencer thought she should reorganize her position into something different. (Spencer Dep., Doc. No. 65-22 at PageID# 1725).

The Court cannot determine whether there was or was not money in the budget for Plaintiff's position. However, viewing the evidence in the light most favorable to the Plaintiff, as the Court must at this stage, the Court finds Plaintiff has submitted evidence from which a jury could conclude that the reason stated for Plaintiff's termination was pretext. There is a genuine issue of fact regarding whether or not Plaintiff was subject to materially adverse action, and whether Plaintiff's protected activity (informal and formal complaints about harassment) was the cause of such action. Accordingly, Defendant's motion for summary judgment on Plaintiff's claim for retaliation is DENIED.

**D. Retaliatory Hostile Work Environment**

A claim for retaliatory hostile work environment requires plaintiff to show: (1) she engaged in activity protected by Title VII; (2) the exercise of her protected rights was known to Defendant; (3) she was subjected to severe or pervasive retaliatory harassment; and (4) there was a causal connection between the protected activity and the adverse employment action. *Cleveland v. Southern Disposal Waste Connections*, 491 F. App'x 698, 707 (6th Cir. 2012)

As in the claim for hostile work environment, to establish a prima facie claim for retaliatory hostile work environment, the plaintiff must show that the harassment was sufficiently "severe or pervasive." *Southern Disposal*, 491 F. App'x at 707. Harassment is actionable under Title VII where "the workplace is permeated with discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment ..." *Khamati v. Sec'y of Dept. of the Treasury*, 557 F. App'x 434, 443 (6th Cir. 2014) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21(1993)).

The issue of whether a hostile work environment exists depends on a number of factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. The Court considers the totality of circumstances to determine whether the alleged conduct is sufficiently severe or pervasive. *Williams v. Gen. Motors Corp.,* 187 F.3d 553, 562 (6th Cir. 1999).

Plaintiff claims that after she complained of Carrasco's behavior, he gave her a bad review, asked her to return to work after hours, and sent a threatening text message. The text message, sent shortly after Carrasco was placed on leave, stated: "Happy Thanksgiving, Vanessa. I hope your home is filled with peace and kindness. God looks out for those who are righteous and forgives those who are not. Be blessed." (Pl. Dep., Doc. No. 79-1 at PageID # 2181). The Director of Schools played a song called "Blow the Whistle" at a principals' meeting shortly before her position was eliminated. (Doc. No. 73, ¶ 40). Plaintiff stated that Deborah Story, who was her immediate supervisor after Carrasco resigned, recorded one of their phone conversations without her knowledge and was "very short and curt" with her. (Pl. Aff., Doc. No. 65-1, ¶ 74). Plaintiff also stated she was excluded from meetings, not able to do parts of her job because "MNPS kept putting up barricades," and did not feel like she was "part of the team." (*Id*., ¶ 75).

The isolated incidents of being asked to work late (twice), receiving a bad review that was not placed in her filed, the text message, and the song, coupled with an atmosphere of generally being excluded and not feeling part of the team do not rise to the level of retaliation that is severe or pervasive enough that a reasonable person would find it hostile or abusive. *See Willey v. Slater*, 20 F. App'x 404, 405-06 (6th Cir. 2001) (finding no retaliatory hostile work

30

environment when plaintiff was subjected to hostility, exclusion, and coldness). The Sixth Circuit has established a high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory. The conduct alleged here does not clear that bar. Therefore, Defendant's motion for summary judgment as to Plaintiff's claim of retaliatory hostile work environment is GRANTED.

## F.  Breach of Contract

Plaintiff claims that Defendant breached a contract to pay her an additional stipend during the 2017-18 school year. (Compl., Doc. No. 20 at ¶ 66).  To establish a breach of contract claim in Tennessee, first and foremost, Plaintiff must show the existence of a valid and enforceable contract. *Federal Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011).  A valid enforceable contract requires consideration and mutual assent, manifested in the form of an offer and an acceptance. *See Ace Design Grp. v. Greater Christ Temple Church, Inc.*, No. M2016–00089–COA–R3–CV, 2016 WL 7166408 (Tenn. Ct. App. Dec. 8, 2016) (citing Restatement (Second) of Contracts §§ 17, 22).  In Tennessee, "[t]he legal mechanism by which parties show their assent to be bound is through offer and acceptance." *Moody Realty Co., Inc. v. Huestis*, 237 S.W.3d 666, 675 n.8 (Tenn. Ct. App. 2007).  An enforceable contract "must result from a meeting of the minds, must be based on sufficient consideration, and must be sufficiently definite to be enforced." *Peoples Bank of Elk Valley v. ConAgra Poultry Co.*, 832 S.W.2d 550, 553 (Tenn. Ct. App. 1991).  The crux of a meeting of the minds is mutual assent to a contract.  "The contemplated mutual assent and meeting of the minds needed to form a contract cannot be accomplished by the unilateral action of one party … in addition, the mere expression of intent or a general willingness to do something does not amount to an 'offer'" *Davidson v. Holtzman*, 47 S.W.3d 445, 453-54 (Tenn. Ct. App. 2000).

Here, the record does not contain a signed agreement regarding the payment of a stipend. Rather, Plaintiff claims that she is owed a stipend based on an email from David Siever to Jill Speering in April 2018 indicating that when Plaintiff's salary went from $155,000 to $130,000, "the decision was made to keep their salaries intact through the end of the fiscal year [2017-2018]" and to "treat the difference as a stipend." (Doc. No. 65-30). In addition, Plaintiff claims she was listening to a school board meeting at which Mr. Siever told the board that she was "supposed to get [her] full salary through the 2017-2018 school year." (Pl. Aff., Doc. No. 65-1, ¶ 96). This is insufficient to show that there was a contract between Plaintiff and Defendant for the payment of a stipend during the 2017-2018 school year. The unilateral statement by Mr. Siever's statement that Plaintiff was "supposed to get a stipend" does not create a contractual obligation. Moreover, the email was sent in April 2018, after Plaintiff had been working for over nine months without receiving a stipend and before any representations regarding the stipend were made.

Plaintiff has failed to demonstrate the existence of an enforceable contract. Accordingly, Defendant's motion for summary judgment on this claim is GRANTED.

## G. Violation of Tennessee Teacher Tenure Act

Plaintiff claims Defendant violated the Teacher Tenure Act (the "Act"), Tenn. Code Ann. § 49-5-511(b), when it allowed its Chief of Human Resources, Deborah Story, to eliminate Plaintiff's position as Executive Director of Leadership Development. Plaintiff maintains that the Teacher Tenure Act mandates that only the school board can make this decision. Defendant argues that the Teacher Tenure Act does not apply to Plaintiff's termination because: (1) Plaintiff was an untenured human resources administrator not covered by Section 49-5-511(b); (2) Plaintiff was lawfully terminated or non-renewed; and (3) the Board of Education did not have

to approve the elimination of her position from Human Resources because it had never been included in the budget.

The Teacher Tenure Act provides:

> When it becomes necessary to reduce the number of teaching positions or nonlicensed positions in the system because of a decrease in enrollment or for other good reasons, the board shall be empowered to dismiss such teachers or nonlicensed employees based on their level of effectiveness determined by the evaluation pursuant to § 49-1-302 for licensed employees and an evaluation of work performance for nonlicensed employees.

Tenn. Code Ann. § 49-5-511(b)(1). The Act defines a teacher as follows:

> "Teacher" includes teachers, supervisors, principals, director of schools, and all other certificated personnel employed by any local board of education, for service in public, elementary and secondary schools in this state, supported in whole or in part by state or federal funds.

Tenn. Code Ann. § 49-5-501(10).

The Tennessee Attorney General has explained:

> Tennessee statutes divide local education employees into two major groups: certificated and non-certificated. Certificated employees (also referred to as "licensed" personnel) are those with a Tennessee teacher's professional license or certificate, and include teachers, principals, supervisors, and directors of schools. This group of employees is comprised of two sub-groups: tenured and non-tenured. Non-certificated employees, in turn, comprise all other school employees such as food service workers, teaching assistants, custodial staff, etc.

Tenn. Op. Atty. Gen. No. 07-117, 2007 WL 2819327 (Aug. 8. 2007).

Plaintiff's position required a valid Administrator License, and Plaintiff held an active Administrator License and Teaching License. The Court finds there is no dispute of material fact that Plaintiff is a certificated employee and, therefore, a "teacher" under the provisions of the Teacher Tenure Act, Tenn. Code Ann. 49-5-501 *et seq.* However, the plain language of the statue does not limit the application of this provision to tenured teachers or even to teachers. *See* Tenn. Code Ann. § 49-5-511(b) ("When it becomes necessary to reduce the number of *teaching*

33

*positions or nonlicensed positions* in the system because of a decrease in enrollment or for other good reasons, the board shall be empowered to dismiss such *teachers or nonlicensed employees*…" (emphasis added)).  Rather, the provision applies, it appears, to all employees, licensed and unlicensed.

Defendant argues that, notwithstanding the requirements of Tenn. Code Ann. § 49-5-511(b), under Tenn. Code. Ann. § 49-2-301(EE), the Director of Schools has the power to nonrenew and dismiss all personnel with the exception of tenured teachers.  Tenn. Code Ann. § 49-2-301(EE) states that the Board shall assign the director of schools the duty to:

> Within the approved budget and consistent with exiting state law and board policies, employ transfer, suspend, nonrenew and dismiss all personnel, licensed or otherwise, except as provided in § 49-2-203(a)(1) *and in chapter 5, part 5 of this title.* (emphasis added).

Chapter 5, part 5, in turn requires that dismissals of all personnel, licensed and unlicensed, tenured and nontenured, be made by the Board if those dismissals are due to a decrease in the number of positions.  *See* Tenn. Code Ann. § 49-5-511(b).

These provisions must be read together with the other parts of the statute.  The Director of Schools has the power to dismiss non-tenured teachers for cause based on "incompetence, inefficiency, insubordination, improper conduct or neglect of duty" under Tenn. Code Ann. § 49-2-301(GG).  Non-licensed employees may be dismissed pursuant to a policy developed by the local board of education. Tenn. Code Ann. § 49-2-301(FF).  All employees, licensed and unlicensed, may be dismissed by the school board if a reduction in the number of positions is required "because of a decrease in enrollment or for other good reasons." Tenn. Code. Ann. § 49-5-511(b)(1).  Accordingly, the Court finds that under the statute, although the Director of Schools has the authority to dismiss nontenured employees for cause, as described in Tenn. Code Ann. § 49-2-301(GG), he does not have the authority to dismiss employees, licensed or

unlicensed, because of a reduction in the number of positions. This conclusion is in accord with the Opinion of the Tennessee Attorney General that the Director has the authority to dismiss all personnel for cause, except that only the Board may dismiss tenured teachers. *See* Tenn. Op. Atty. Gen. No. 07-117, 2007 WL 2819327 (Aug. 8. 2007).

Plaintiff was not dismissed for cause as provided by Tenn. Code Ann. 49-2-301(GG). Defendant has consistently stated she was dismissed because her position was eliminated due to budgetary reasons. (Def. Resp., Doc. No. 70 at 6-7). In fact, Defendant acknowledges that "Plaintiff's employment was terminated by MNPS's Chief Human Resources Officer Deborah Story, after Ms. Story and the other MNPS chiefs were told to make significant cuts to their budgets." (Def. Resp., Doc. No. 70 at 11 (citing Story Dep., Doc. No. 70-5 at PageID# 1947).

Defendant contends that because Plaintiff's position had never been moved in the budget, it did not include the position as an eliminated position in the list approved by the School Board. (*Id*. at 8). Defendant argues, "Tenn Code Ann. § 49-511(b) does not apply to Plaintiff because no Human Resources position was eliminated when she was terminated." (*Id*.) Defendant concludes, "Although Plaintiff's employment ended, Human Resources did not eliminate a budgeted position, nor did the department reduce its number of [full time positions], and, therefore, Plaintiff did not have to be terminated by the Board." (*Id*. at 9).

Defendant appears to conflate the position and the funding for the position. It is undisputed that Plaintiff had a position in Human Resources during the 2017-2018 school year and that her position was eliminated. The text of the statute says nothing about "budgeted positions." It says, "number of teaching positions or non-licensed positions." This is not a matter of the Board's duty to approve the budget, which is provided for elsewhere in the Tennessee Code. *See generally*, Tenn. Code Ann. § 49-2-203. Rather, the provision at issue provides a

procedure for dismissing teachers and other employees due to a reduction in positions based on their level of effectiveness or evaluation of work performance and establishes a preferred list for reemployment. Tenn. Code Ann. § 49-5-511(b)(1) – (4).

Plaintiff had a position and then the position was eliminated, allegedly for budgetary reasons. It is disingenuous for Defendant to now argue that the position never existed because of a clerical error. The funding for Plaintiff's position may not have existed, but the position itself certainly did.[8]

Defendant argues, in the alternative, that if Plaintiff is a "teacher," her contract was subject to nonrenewal by the Board or the Director of Schools under Tenn. Code Ann. § 49-5-409.[9] This provision requires that teachers continue in service "until they have received written notice from their board of education or director of schools, as appropriate, of their dismissal or failure of reelection. The notice must be received within five (5) business days following the last instructional day of the school year to be applicable to the next succeeding school year." Tenn. Code Ann. § 49-5-409(a). *See Dallas v. Shelby Cty. Bd. of Ed.*, W2018-01661-COA-R3-CV, 2019 WL 3918735 (Tenn. Ct. App. Aug. 19, 2019).

Other than the fact that Plaintiff was terminated within the statutorily required timeframe for nonrenewal, Defendant has provided no evidence that it complied with the requirements of

---

[8]     In addition to the fact that Plaintiff was actually performing the job of Executive Director of Leadership Development, the position with her name next to it is included in a list of positions for FY 2018-2019. (Doc. No. 65-12). It is also listed in an April 16, 2018, draft budget. (Doc. No. 65-7 at 4). Defendant claims that the remarks in the April 2018 draft budget were mistakenly left over from a previous year. (Def. Resp., Doc. No. 70 at 9 (citing Spencer Dep., Doc. No. 70-4 at PageID# 1934.)). Rather than support Defendant's argument that the position never existed, this appears to be more evidence that Plaintiff had a position and that the position was eliminated.

[9]     The broad definition of "teacher" in Tenn. Code Ann. § 49-5-501 applies to Part 5. It is not clear that Plaintiff is a "teacher" under Tenn. Code Ann. § 49-5-409, "Continuing Contract Law," as this provision is found in Part 4.

the nonrenewal statute.  Importantly, Defendant has submitted no evidence that Plaintiff received *written notice* of nonrenewal *from the Director of Schools*.  Nor does Defendant assert that "nonrenewal" was the actual reason for terminating Plaintiff.  Accordingly, the Court need not address whether Defendant could have nonrenewed Plaintiff's contract under the terms of the statute.[10]

The Court notes that Defendant does not argue that the School Board implicitly approved Plaintiff's dismissal when it approved the budget for the 2018-2019 school year, which did not include Plaintiff's position.  Instead it argues that it was not required to get School Board approval because Plaintiff's position never existed.  The Court rejects this argument and finds that under the facts presented on the motion for summary judgment, Plaintiff has shown there is no dispute of material fact that Defendant did not comply with Tenn. Code Ann. § 49-5-511(b)(1) when it dismissed Plaintiff due a reduction in the number of positions.  Accordingly, the Court GRANTS summary judgment on this issue in favor of Plaintiff.  However, because the parties have not fully briefed the issue of damages on this issue, the Court will submit that issue to the jury.

---

[10]     If Tenn. Code Ann. § 49-5-409 applies to Plaintiff and she was not given notice under the statute of nonrenewal, her contract automatically renewed for the next school year and she was then subject to dismissal only for cause or because of a reduction in positions, which the statute provide must be carried out by the Board.

## IV.    CONCLUSION

For the reasons stated, Defendant's Motion for Summary Judgement is GRANTED in part, DENIED in part.  Defendant's Motion is DENIED as to the claims for hostile work environment, retaliation, and violation of Tenn. Code Ann. § 49-5-511, and GRANTED as to the claims for retaliatory hostile work environment and breach of contract.  Plaintiff's Motion for Partial Summary Judgment on her claim for violation of Tenn. Code Ann. § 49-5-511(b) is GRANTED as to the issue of liability.

WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE